STATE EX REL. BALDWIN, RESPONDENT, *v.* KELLOGG, APPELLANT.

[Submitted May 14, 1894. Decided June 4, 1894.]

PHYSICIANS AND SURGEONS—*Medical Examiners—Pleading.*—While a complaint in proceedings instituted before the state board of medical examiners to revoke a physician's license must set forth facts which constitute an offense pleadings must not be too strictly construed nor should too close observance of the science of pleading be required.

SAME—*Same—Revocation of license—Sufficiency of complaint.*—Revocation of a physician's license for unprofessional, dishonorable, and immoral conduct cannot be sustained upon a complaint which merely charged that on a given date the defendant placed in a furnace a headless fœtus, about seven months old, with intent to destroy the same and conceal its birth; and that at the coroner's inquest over such fœtus he testified that the child was the result of a miscarriage, its head having become detached in delivery; that he would not disclose the mother's name, as she had requested him not to make it known, and that he had been advised that he need not disclose it; that he withheld it, not through fear of incriminating himself, but to avoid the publicity it would give the mother, but that he would give her name to the coroner the next day, who could use his discretion in the matter, while upon the next day he refused to give her name upon the ground that she had left the state, and without her presence to explain her condition at the time his answer might incriminate him, since neither the attempt to burn the fœtus nor the refusal to disclose the mother's name was of necessity either unprofessional, dishonorable, or immoral, but both were acts as consistent with innocence as with guilt. (HARWOOD, J., dissenting.)

*Appeal from First Judicial District Lewis and Clarke County.*

SPECIAL proceeding instituted before the state board of medical examiners to revoke defendant's license to practice medicine and surgery. The board convicted defendant of unprofessional, dishonorable, and immoral conduct, and revoked his license. Defendant appealed to the district court. The cause was tried before BUCK and HUNT, JJ., sitting concurrently, who rendered a judgment revoking defendant's license. Reversed.

Statement of the case by the justice delivering the opinion:

The state board of medical examiners organized and have been acting under the provisions of what is called the "Medical Law," which was approved February 28, 1889 (16 Sess. Laws, p. 175.) The appellant is a practicing physician in the state of Montana. The proceedings which resulted in this appeal were originally instituted before the medical board for the purpose of revoking appellant's license as a physician and surgeon. The Medical Law, above quoted, provides that the board may revoke a physician's certificate for unprofessional, dishonorable, or immoral conduct. The complaint which was filed before the medical board against the appellant, Dr. Kellogg, charged him with such conduct, and gave specifications. The portion of the complaint which is material in this inquiry is as follows:

"BOARD OF MEDICAL EXAMINERS OF THE STATE OF MONTANA, PLAINTIFF, *v.* EDWIN S. KELLOGG, DEFENDANT.

"STATE OF MONTANA, } *ss.*
"County of Lewis and Clarke. }

"S. C. Baldwin, being first duly sworn, deposes and says that between the first day of March, 1893, and the thirty-first day of March, 1893, at the city of Helena, in the county of Lewis and Clarke, and state of Montana, one Edwin S. Kellogg, late of the county of Lewis and Clarke, in the state of Montana, being then and there a practicing physician and surgeon, and being then and there the holder of a certificate to practice medicine and surgery in the state of Montana, issued by the board of medical examiners of the state of Montana, was guilty of unprofessional, dishonorable, and immoral conduct in this, to wit:

" 1. That upon the fourth day of March, 1893, said Kellogg placed in the furnace of that certain building in the city of Helena, said county and state, known as the 'Masonic Block,' situated at the corner of Broadway and Jackson streets, in the said city, in which block said Kellogg had an office as physician, a package covering and containing a headless fœtus, about seven months old, with intent to destroy the same, and to conceal its birth.

" 2. That at the coroner's inquest held at the courthouse in the city of Helena by Dr. T. H. Pleasants, the coroner of the said county of Lewis and Clarke, over the said fœtus, the said Kellogg testified as a witness, after having been sworn, upon the eighth day of March, 1893, to testify to the truth, the whole truth, and nothing but the truth, substantially as follows: That he had been called in to attend a woman who shortly afterwards suffered a miscarriage. That she was delivered of a child, and that, while being delivered, the head of the infant became detached from the body; that he took the body of the infant to his office, wrapped it in a sheet of paper, and threw said body into the furnace of the Masonic Temple; that he had before thrown amputated members of the bodies of persons in said furnace. The party referred to as being the patient from whom the fœtus was taken asked not to have her name made known, if possible to avoid it, and that he had been advised that he need not answer it unless he chose to do so. He declined to answer, not because he is afraid of incriminating himself, but to avoid the publicity of the lady's name in the papers. The fœtus had been dead four or five days when taken away. The head was in part detached. The fœtus is three months and one week old. He is willing to disclose the name of the lady to-morrow, at 2 P. M., to the coroner, who will use his discretion in the matter. And that thereafter, upon the ninth day of March, 1893, said Kellogg testified, as such witness, still further: 'The person whose name you ask for has left the state of Montana, and is beyond and without the jurisdiction of any court of the state of Montana. Without the presence of that person to explain and certify to her condition at the time the fœtus was taken from her, my answer, under the

existing circumstances, would incriminate me, and be testimony against myself, and on that ground I refuse to answer.'"

The appellant duly appeared before the medical board to answer the charge and specifications contained in the complaint. Upon his appearance he filed a demurrer, the ground of which was that the complaint did not state facts which amounted to unprofessional, dishonorable, or immoral conduct. This demurrer was argued before the board, and was overruled. The board then proceeded to try the appellant upon the complaint. The result of the trial was that the appellant was found guilty, and it was adjudged that his license be revoked.

In pursuance of the provisions of the Medical Law the appellant appealed from the board to the district court. In that court he reargued, and insisted upon his demurrer. The demurrer was overruled by the district court. He was thereupon tried upon the complaint, and found guilty, and it was adjudged that his license be revoked. From that judgment appellant appeals to this court.

*T. J. Walsh,* for Appellant.

The complaint charges in substance that the defendant threw a headless fœtus, about seven months old, into the furnace of the building in which was his office, with intent to destroy the same and conceal its birth; that at a coroner's inquest held upon such body he testified that it was three months and a week old; that he did not desire to give the name of the mother, not from fear of incriminating himself, but to avoid publicity, and that he was willing to give the name to the coroner next day; that the next day he appeared and informed the coroner that the lady had left the state, and that in her absence and without her testimony concerning her condition, his answer would incriminate himself and be testimony against him, and that he therefore refused to give it; that thereupon defendant was committed for contempt; that he was released on *habeas corpus,* and never gave the name of the woman; that defendant failed to report the birth of the child in violation of section 2 of article V of chapter XIII of the ordinance of the city of Helena concerning notification of births within the said city. There is not a suggestion in the complaint that there was a

word of untruth in any thing that the defendant said. He said the fœtus was three months and a week old, when in fact it is alleged it was seven months, but there is no allegation that he falsely said so, or that he knew any better, or that it was not a mistake in judgment. The court held upon the *habeas corpus* proceedings that he had a perfect legal right to refuse to answer, and it is difficult to understand how his refusal to answer can be urged against him, that is, how his certificate can be annulled for doing what the law allowed him to do. For the constitutional privilege cannot be made to read, "No person shall be compelled to testify against himself, but if he claim this privilege his right to practice his profession shall be taken away from him." And yet this complaint must be sustained, if sustained at all, on the theory that claiming the privilege not to testify is a confession of crime. The law is otherwise. (Greenleaf on Evidence, 450; *State* v. *Bailey*, 54 Iowa, 414; *Carne* v. *Litchfield*, 2 Mich. 340; *State* v. *Mannansan*, 60 Mich. 15; *Phelin* v. *Kenderline*, 22 Pa. St. 354–63; *Rose* v. *Blakemore*, Ryan & M. 382; *Lloyd* v. *Passingham*, 16 Ves. 64; 2 Phillips on Evidence, 949, 950; Rapalje on Witnesses, 267.) The claim of violation of the city ordinance is not insisted on. But if it were the complaint does not aver that the birth occurrred within the city, nor that the child ever lived. The act was not intended to compel a record of miscarriages. But the offense defined is simply *mala prohibita*, and nothing is "unprofessional" unless it is either immoral or dishonorable. (*State* v. *Medical Board*, 32 Minn. 312.) The complaint further does not state whether the defendant's certificate was issued under the provisions of section 3, or section 4 of the Medical Act. If it was issued under section 3 the board had no jurisdiction to revoke it.

*Attorney General Henri J. Haskell, C. B. Nolan, and Blake & Penwell,* for Respondent.

Proceedings of this character are analogous to charges preferred against an attorney, and are not required to be formal or technical like an indictment. (*Randall* v. *Brigham*, 7 Wall. 539, 540; *In re Randall*, 11 Allen, 478, 479.) It is charged in the complaint that appellant placed in a furnace a package

covering and containing a headless fœtus about seven months old, with the intent to destroy the same and conceal its birth. It is charged that a judicial investigation concerning said fœtus was held by the coroner, and that appellant was sworn as a witness to testify to the truth, the whole truth, and nothing but the truth. It is charged that appellant declined to give the name of the mother of the fœtus, not because he was afraid of incriminating himself, but to avoid the publicity of her name in the papers, and that he was willing to disclose her name to the coroner upon the next day; and that upon the following day appellant testified that his answer in that matter "would incriminate him and be testimony against himself, and on that ground I refuse to answer." It is charged that proceedings were had to compel appellant to answer the question respecting the name of the mother of the fœtus, that the court ordered the discharge of the appellant from custody, and that appellant never gave the name of this party. Respondent maintains that it was the duty of appellant to assist the officers of the government who were trying to determine whether a crime of a heinous nature had been committed. This obligation to society rests upon all good citizens regardless of professional ethics. Appellant interfered with the administration of justice and did not testify to the whole truth before the coroner's jury. Appellant was guilty of bad faith and did not keep his promise to give the coroner the name of the mother of the fœtus. Appellant was guilty of duplicity, if not perjury, in assigning one reason for his refusal to testify on one day and stating a different reason therefor upon the next day. Appellant contends in his brief that he "had a perfect legal right to refuse to answer." That is not the charge. How long would this court permit an attorney to practice his profession if he refused to give an answer to a question in a judicial inquiry upon the ground that his answer would prove him guilty of a felony? Why was appellant destroying a headless fœtus and concealing its birth from the officers of the law? The effect of the conduct of appellant is evident; the charges are plain, and appellant offered no explanation of his acts upon the trial, and does not attack the judgment upon the ground that it is contrary to the evidence. Professor Ogston in his lectures on medical

jurisprudence says: " When called into court to give evidence the witness is first sworn to tell the truth, the whole truth, and nothing but the truth, words admirably calculated to impress him with the solemnity of the occasion, as well as to prevent concealment on his part." (Page 18.)    " In adducing his testimony the medical witness is not at liberty to withhold any information which may bear on the case, in whatever way it has been acquired.    On this principle it has been held that a practitioner is even bound to disclose the secrets divulged to him in the course of his professional attendance, however much it is to be lamented that such disclosures should be made the subjects of judicial publication."    (Page 21.)    These are the views of one of the most eminent physicians, and the rule should be applied to appellant.

DE WITT, J.    This case comes to us entitled " *The Board of Medical Examiners of the State of Montana* v. *Edwin S. Kellogg.*"    It should probably bear the title as written at the head of this report.

The trial and argument of this case have taken a wide scope, but upon the threshold of the inquiry we meet, perhaps, the most important question involved.    The complaint before the medical board was the original pleading in the proceeding, corresponding to the complaint or declaration in a civil case, or indictment or information in a criminal case.    The medical board is a special tribunal, created by the medical law, and having jurisdiction over a limited subject matter.    (16 Sess. Laws, p. 175.)    The tribunal is composed of physicians, and not of any persons who are required to be learned in the law.    We are of opinion that, before such a tribunal, pleadings should not be too strictly construed, nor should a too close observance of the science of pleading be required.    But it cannot for one moment be doubted that the complaint must set forth facts which constitute an offense.    A defendant in such a proceeding is to answer a charge of unprofessional, dishonorable, and immoral conduct.    If the judgment is against him he is deprived of the right to practice his profession, to which perhaps he has devoted a life of learning and labor.    In a situation of this gravity a defendant has the right, within the spirit

of the constitution, "to demand the nature and cause of the accusation" (Const., art. 3, § 16); that is to say, a defendant must be notified of what he is charged, and he must be charged with something. The complaint must set out facts which constitute unprofessional, dishonorable, or immoral conduct. This defendant has constantly insisted that the complaint in this proceeding does not set out such facts, and he so urges in this court. To that inquiry we will first address ourselves. We will examine, *seriatim*, what is said in the complaint. Taking up the first paragraph, and holding up to inspection the facts stated, we observe, first, that the defendant, a physician, threw into a furnace, with intent to destroy it, a human fœtus, seven months old. Was this unprofessional conduct? This court is in possession of a few elementary physical facts. Among them is the fact that the mothers of the human race, living under the conditions of higher civilization, do not always, or indeed often, bear children without aid and attentions from persons skilled in matters obstetrical. We also know that premature deliveries and accidents, commonly called "miscarriages," occur. At such times physicians are called to render services. In the course of such services the physician must become possessed of fœtuses. It is professional that he should. It is not immoral or dishonorable that he should. No argument to this effect can say more than the simple statement. It is a postulate to which every intelligence assents. Nor can it be contended that the simple fact of destroying such a thing is unprofessional, immoral, or dishonorable. In fact it must be destroyed. Sanitary rules demand its destruction; and incineration is certainly as proper as inhumation, or any other method of destruction. No reason is discoverable why the physician may not properly destroy such waste human substance, as that he may destroy the amputated leg or arm of another of his patients.

But the weight, if any there be, of this specification of the complaint, is that the defendant destroyed this fœtus with the intent to conceal its birth. If defendant were charged with criminal abortion, the concealment of the product of the abortion might be presented as evidence tending to prove his guilt. But the fact must not be lost sight of that in this case the com-

plaint does not pretend to charge Dr. Kellogg with commit-
ting an abortion.   Therefore the only charge of this paragraph
of the complaint is that he intended to conceal a premature
delivery of a human fœtus.   There are such deliveries which
are accidental, unintentional, and wanting in all criminal pro-
curement, intent, or act, either by the mother, the physician,
or any one, and due only to casualty or the weakness of nature.
For aught that appears in this complaint the fœtus described
came from just such an accident.   The court cannot presume,
in the absence of a charge, that the fœtus came from a criminal
act, instead of an innocent one.   Therefore, assuming that this
fœtus was produced by no criminal act (and it must be so
assumed when no criminal act is charged), and assuming that
defendant was lawfully in possession of it (and the contrary is
not charged), then was it immoral, dishonorable, or unprofes-
sional to conceal its birth?   The inquiry reduces itself to this
simple proposition: Is it immoral, dishonorable, or unprofes-
sional for a physician to conceal the fact that one of his
patients has innocently suffered the accident of a fœtal miscar-
riage?   For nothing more than this is specified in the com-
plaint.   It is not specified that the defendant intended to
conceal the fact of a criminal miscarriage or abortion.   We
unhesitatingly say that it is not immoral, dishonorable, or
unprofessional for a physician to conceal the fact of such an
innocent accident.   It is but stating the common knowledge
of all persons living in and observing modern social life to say
that it is natural and proper that a woman who suffers such
an accident desires that it be not proclaimed to the community.
As long as it is an accident, neither morals, public policy, nor
law require that it should be so heralded.   Both the patient
and physician are right in concealing it.   Such accident may
be the disappointment and misfortune of the family, anxious
for offspring; or it may be the imprudence, shame, and disgrace
of her who has no social right to be in a condition where such
an accident could happen.   In either case, in the absence of
any criminal or immoral act or intent by any one in procuring
the premature birth, the concealment is not immoral, dishonor-
able, and unprofessional.   Publicity would work no good.
Concealment works no harm.   Publicity might bring needless

suffering, mortification, and distress, where no crime or immorality had been committed in the miscarriage.

What is said in this opinion is possibly liable to misunderstanding, unless it be clearly kept in mind that we are treating only the charge and specifications of the complaint, and are not going beyond that pleading. At the risk of prolixity and reiteration we must add emphasis to our declaration that in this complaint no abortion and no criminal act are charged in reference to the production of this fœtus. Let it be clear that we say nothing condoning sexual immorality, or tolerating the act of a physician who criminally interrupts the course of nature in the production of the species. We are not pronouncing upon whether Dr. Kellogg was guilty of immoral, dishonorable, or unprofessional conduct; but we do say that the complaint, by the natural and necessary construction, does not specify it. We do say that this first paragraph of the complaint could be specified against a wholly innocent physician; and we do say that no professional ethics or morality or honor can require a physician to herald to a community the accidents or misfortunes of his patients, when no criminal or immoral acts are connected with such accidents or misfortunes, and no law or public policy requires their revelation. It is true that counsel for the medical board contend that public policy demanded that Dr. Kellogg reveal to the coroner the name of the mother of the fœtus. But that branch of the complaint will be discussed later. We are now treating only the allegation of the intent to conceal the birth, and holding that such concealment was not, in itself, in the absence of the specification of any criminal act or intent, either immoral, unprofessional, or dishonorable.

We advance to the second specification of the complaint. It recites the holding of a coroner's inquest over the acephalous fœtus described in the first paragraph of the complaint. At that inquest the defendant was a witness on the eighth day of March, 1893. He testified that he had been called to attend a woman who had suffered a miscarriage, and that the fœtus resulting therefrom was the one which he had thrown into the furnace. What he testified to before the coroner appears fully in the complaint, which is recited in the statement of this case

preceding this opinion. It is the story of an ordinary accidental miscarriage. If what he testified was true as to the birth of the fœtus there is nothing which squints at immoral, dishonorable, or unprofessional conduct. And let it be marked that the complaint does not say that one word which Dr. Kellogg uttered before the coroner's inquest was false. It does not charge that he testified for the purpose of concealing a crime or impeding the administration of law. It is not charged that he suppressed the truth, or any part thereof, or spoke that which was false in any part thereof. He testified that the fœtus was three months and a week old, but, for all that appears, this was his professional opinion. He refused to give, at the inquest, the name of the mother, for the reason that she had requested him not to make it public if it could be avoided, and he had been advised that he was not required to do so, but that he would give the name to the coroner the next day, who could use his discretion. All this is set up in the complaint; that is, the complaint specifies that Dr. Kellogg testified, as just recited, at the coroner's inquest. No immoral, unprofessional, or dishonorable conduct can possibly be construed from this testimony of Dr. Kellogg before the coroner. If the miscarriage which he attended was innocently accidental (which it was, as far as it appears in the specification), it was not immoral, unprofessional, or dishonorable for him to decline to give the name of the woman, unless positively required to do so. Indeed, there is a very prevalent belief that it would be unprofessional and dishonorable for a physician to disclose the name and ailments of his patients without their consent, or unless he were required so to do. Dr. Kellogg refused to give this name at a public inquiry, for the reason that his patient had requested him not to, and he believed he was not required to. The question is not whether Dr. Kellogg disobeyed or disregarded the rules of evidence in judicial inquiries; but the question is whether it was immoral, unprofessional, or dishonorable conduct for him to refuse to testify when he believed that honor required him not to, and he was advised that the rules of evidence did not require him to testify. Of course he could be compelled to answer this question if it were a legal and pertinent inquiry at a judicial investigation, and the legal-

ity and pertinancy of the inquiry would be determined by the proper tribunal. We are not discussing that .matter. It is not before us. The matter before us is, Was Dr. Kellogg's attitude and testimony before the coroner's inquest, on March 8th, immoral, dishonorable, or unprofessional? To the question we answer, "No." He offered to disclose the name of the woman to the coroner (privately, it would seem), that the coroner might use his discretion. This portion of the complaint comes down to this proposition: It was not immoral, dishonorable, or unprofessional conduct for Dr. Kellogg to refuse to reveal the innocent, noncriminal secrets of his patient (for they are not specified to be other than noncriminal and innocent), when he was requested not to, and was advised that he was not required to. Whether this advice to him was sound, and whether he could be required to testify, is not here the inquiry.

So far in the complaint, we say, without hesitation, that there is nothing to engage the serious attention of a tribunal assembled to try Dr. Kellogg for immoral, dishonorable, and unprofessional conduct. But we now come to the portion of the pleading which, taken with what precedes it, has occupied our most careful and deliberate thought. It has already had the investigation of the eminent tribunal of physicians who constitute the medical board, and the judicial inquiry of an able court of general jurisdiction. Our own study has impressed us with the importance of the final decision of this case. It is the first decision of this court upon the nature and sufficiency of a charge and specifications to put a doctor of medicine upon his defense for immoral, dishonorable, or unprofessional conduct. While we extend all approval to legislation intended to exclude immoral and dishonorable conduct from an honorable profession, yet the spirit of our American law is such that we must hold that a doctor, to be tried for professional misfeasances, is as much entitled to a clear charge and specification against him as has a burglar or murderer the right to a definite, specific indictment.

But as to the *gravamen* of the specification against defendant. The complaint goes on to say that on March 9th, the day following the giving of Kellogg's testimony, heretofore

discussed, he further testified at the inquest that the woman whose name was demanded had left the state, and was beyond the jurisdiction of any court of Montana, and, without her presence to explain her condition at the time the fœtus was taken from her, his answer, under the circumstances, would incriminate him, and be testimony against him, and for that reason he refused to answer. Such is the specification of the complaint following the other facts set up in that pleading. Was this immoral, dishonorable, or unprofessional conduct? As before noted ·it is nowhere charged that Dr. Kellogg had committed an abortion. It is now to be observed that it is not charged that Kellogg procured the woman to leave the state *for any improper purpose,* or at all, or that he even knew of her intention to leave. It is not charged that what Kellogg testified on March 9th was false. It is not charged that Kellogg testified as he did on March 9th for the purpose of impeding the administration of justice, or hampering a judicial inquiry. It is not charged that his conduct had such result or tended thereto. Such charges are abundant in the argument of counsel, but in the complaint they are conspicuous by their absence.

So this portion of the complaint, like the other portions examined, reduces itself to a simple proposition. The prosecution contend that Kellogg admitted that there existed facts in his professional relations which were criminal, and that, therefore, he admitted that he was guilty of crime in his professional conduct, and that such conduct would of course be immoral, dishonorable, and unprofessional conduct. If this position is sound, and the complaint sustains it, there is a cause of action set out which would sustain a judgment of revocation of defendant's license. It is appropriate here to inquire what crime Kellogg admitted, if any. None being anywhere specified, the student of the complaint must grope for the crime, the admission of which it is claimed the defendant made. The defendant contends that a refusal by a doctor to testify, on the ground that his testimony would incriminate him, cannot be used against him on a trial for immoral, dishonorable, or unprofessional conduct. He cites decisions of cases in criminal prosecutions. Without applying that doc-

trine, or deciding whether it is applicable, we will regard the case from another point of view. The question is, Was Kellogg's refusal to testify immoral, dishonorable, or unprofessional conduct? And the question is not whether it was evidence tending to prove that he was guilty of such conduct. If Kellogg had been charged with criminal abortion, or any other crime (which he was not), then his refusal to testify at the inquest might, if it were admissible as evidence against him, tend to prove his guilt. But, at the very most, the refusal to testify, in the point of view from which we are now considering it, was not an offense in itself, but was simply sought to be held up as evidence tending to prove an offense, and an offense which was not named in the complaint, but left to conjecture. This is a *quasi* criminal action. A defendant is entitled to a more certain charge.

On March 8th Kellogg said he would give the name of the woman to the coroner. On March 9th he refused to do so. But circumstances had, without Kellogg's procurement, changed in the *interim*. The woman had left the jurisdiction. Then Kellogg expresses his opinion that, without her presence to state the truth, for him to give her name would criminate him. How it would criminate him we do not perceive. But he thought it would. This was his own opinion. He was not advised upon this point, as he was upon the matter of his testifying the day before. When he said that to give the woman's name would criminate him it is fair to consider that there was in view what was likely to follow giving the name; that is, an inquiry into the facts of her miscarriage. Now, Kellogg believed that, in her absence, such inquiry would tend to criminate him. His position in this was consistent with ordinary human nature, as we see its operations. It was consistent with innocence. If one be placed under suspicious circumstances, and he is suddenly and unexpectedly deprived of the material testimony which would prove his innocence, as he believes, it is perfectly natural that he should think that inquiry into the circumstances would tend to criminate him. This is all that appears against Kellogg in the complaint. His conduct, to be sure, can be explained upon the hypothesis of guilt. It is entirely consistent with the fact of his having committed

a criminal abortion, and attempting to conceal the same.    If he were guilty of such a crime he might have naturally pursued just the course which is specified in the complaint.

But, on the other hand, that which must demand our attention is that a wholly innocent man could have acted just as Kellogg did.   Whether an innocent man would have so acted is not the inquiry.   He could have, and he might have, so conducted himself; that is to say, the specifications of the complaint do not at all clearly exclude the supposition of the innocence of the defendant.   They do not show that defendant could not be innocent, and the complaint be true.   The complaint hints at guilt, but leaves open the hypothesis of innocence.   If the complaint be true the defendant may be guilty, and he may be innocent.   Pleading of such a nature would not do in a civil case.   It surely must not be allowed in a *quasi* criminal case.   Concede that the facts set up in the complaint raise a grave suspicion of the commission of an abortion by the defendant.   Must he prepare for trial upon a suspicion?   To be sure, a member of an honorable profession, as that of medicine, should raise his conduct above suspicion. But if circumstances arise which may, under one construction, cast a suspicion upon a physician and if the circumstances are susceptible also of a construction consistent with his innocence then, if the construction of guilt is to be adopted, the guilt should be charged, and not left to inference.   The plain fact is that the complaint in this case is curious.   It seems as if the pleader hesitated at making a specification of immoral, dishonorable, or unprofessional conduct, and contented himself by narrating circumstances of suspicion, with the intention of seeing what the defendant might say.   It was a process of throwing suspicion upon the defendant, and leaving him to prove himself innocent.   Such is not the American system of judicial procedure.   The complaint is a fascicle of hints, inferences, innuendos, and gossip, with the wraith of an abortion hovering over all.

The defendant was found guilty upon the trial.   Whether the evidence was sufficient to establish immoral, dishonorable, or unprofessional conduct we do not know, as it is not before us.   But if it were, and the defendant were clearly proven

guilty, we would not be able to approve the judgment upon the complaint; for, as the complaint does not set forth facts specifying immoral, unprofessional, or dishonorable conduct, the judgment upon such complaint must be set aside.

The judgment is therefore reversed, and the case is remanded, with directions to sustain the demurrer.

*Reversed.*

PEMBERTON, C. J., concurs.

HARWOOD, J. (dissenting).—The only question considered on this appeal is whether the complaint in the case states facts sufficient to constitute the charge of unprofessional, dishonorable, or immoral conduct on the part of defendant, as a physician and surgeon, practicing that profession in this state pursuant to the privilege granted under the laws thereof. (16th Sess., Laws 1889, p. 175.)

The statute provides that a board of "seven skilled and capable physicians," residents of the state, shall be appointed by the governor, with the advice and consent of the senate, as a state board of medical examiners, and invests said board with jurisdiction to make examination as to the qualification of persons applying for permission to practice the profession of physician and surgeon in this state, and, when found duly qualified, to grant a certificate to that effect. And this statute further provides that said board "may refuse or revoke a certificate for unprofessional, dishonorable, or immoral conduct"; providing, also, for appeal from the action of the board in that respect, to the district court, by the party feeling aggrieved.

Upon the charge preferred by this complaint, defendant was tried before said board of medical examiners, and found guilty of conduct of the character denounced by the statute, and thereupon his license to practice medicine in this state was declared forfeited and revoked. Defendant appealed from that judgment to the district court within and for Lewis and Clarke county, wherein the charges set forth in the complaint were, by demurrer, challenged as insufficient in substance; but, on consideration thereof, the complaint was held sufficient by the learned judges of the two departments of said court, sitting concurrently; and, as a result of the trial *de novo* which ensued

in the district court, defendant was again convicted, where-upon the judgment of the board of medical examiners was affirmed.

In considering the question as to the sufficiency of this complaint, it should be constantly borne in mind that the board of medical examiners did not assume to put defendant on trial for a criminal offense, obviously because said board had no jurisdiction of such offenses. Its inquiry deals entirely with the question whether defendant's conduct, described in the complaint, so grossly violates principles of morality and professional honor as to merit revocation of the privilege to practice medicine in this state, granted pursuant to the laws thereof, subject to revocation for conduct which violated those principles.

It is well understood that there is a broad field for human action between the boundaries of moral rectitude and honorable conduct and that of crime, wherein conduct, if afforded an opportunity, may be extremely pernicious, reprehensible, and injurious in its effect and influence both upon individuals and society at large. Unfortunate as this may be, the law does not assume to set up an ethical standard, and compel conformity thereto, regarding the ordinary relations of individuals. In general, the law wisely leaves the condemnation and punishment of moral obliquity to conscience and such other consequences as flow from transgression of the principles of morality and honor, until such conduct descends into the darker regions of moral turpitude bounded by the Criminal Code.

But while such is the state of the law generally in its operations upon conduct, there are certain relations and privileges in civilized society subject to legislative regulation, such as the practice of law and medicine, and other official and *quasi-official* relations of great honor and trust, wherein the law demands as qualification a standard of conduct higher than that which barely escapes the criminal calendar.

The physician's calling touches matters of transcendent concern—the well-being and the preservation of the human body. His equipment comprises special knowledge and agencies, whereby the secret laboratories of nature may be invaded, and its delicate functions and processes disrupted or deranged, to

the permanent injury, or perhaps destruction, of the victim of malpractice, whether happening through design or unconscionable neglect. His conduct and ministration, whether wise, honorable, and beneficial, or dishonorable and pernicious, is largely veiled in obscurity, and the assurance of fidelity therein depends almost wholly upon honor and moral integrity. The law therefore wisely and prudently demands that the high privileges and important duties of that profession be committed to those guided by principles of morality, honor, and professional ethics, and that the privilege be revoked for gross and undoubted violations of those standards of conduct. I say gross and undoubted violations, because the consequence of revocation of the privilege, on the charge of dishonorable, immoral, and unprofessional conduct, is so blighting to the social and professional career of the individual involved as to admonish tribunals charged with the administration of the law to insist that the forfeiture and revocation shall be declared on accusations of no light or indifferent character, or which fall short of charging conduct undoubtedly in violation of the principles of morality and professional honor.

The charge should be certain, and accuse defendant of such conduct as when confessed, or found from the proofs to be true, if not avoided by showing in defense that it proceeded from excusable mistake, deception, or misadvice, which would be purely matter of defense, not to be presumed, there could be no other reasonable conclusion than that the accused had been guilty of conduct which violated principles of morality and honor.

Let the complaint in the present case be examined to see whether it comes up to the test of these exactions. In point of conciseness, clearness, certainty, and particularity of averment, it compares directly to an indictment, and is subject to no criticism. If the facts set forth are well pleaded as to form and certainty of statement, the presumption is, as frequently asserted in the authorities, that the pleader stated as strong a case as the proofs will support; and if, in substance, the charge is held to be insufficient, it is no fault of the pleader. But in substance, also, in my opinion, this complaint is sufficient.

It is manifest that the learned counsel, in drawing this

complaint, fully understood that the province of the board of medical examiners was not to try defendant for violation of criminal law, but to inquire and pass upon the moral and professional aspect of his conduct, as exhibited in the facts alleged.

The complaint sets forth that, at a certain time in the jurisdiction mentioned, defendant was guilty of dishonorable, unprofessional, and immoral conduct, in that at a certain time and place, particularly described, defendant was found in possession of said fœtus, and undertook to dispose of or destroy the same, in the manner described in the complaint.

These are substantive facts, alleged with particularity and certainty, and manifest in themselves that the mother had given birth to said fœtus prematurely, and against the course of nature, and that defendant was so far concerned in that event as to have had possession and attempted to dispose of the result of such miscarriage. The learned counsel who formulated the complaint no doubt clearly apprehended also that those facts, although important, would not alone support the charge preferred against defendant, and were not, taken alone, incompatible with innocent conduct on the part of defendant in reference to the causes which may have led to said birth—no more so than the mere possession of stolen property would support the charge of larceny. The possession of stolen property, although an important fact, is not entirely inconsistent with innocence on the part of the possessor; and a man of probity could readily dispel all suspicion of dishonor and criminality by proper explanation of the circumstances which brought him into such relation with the subject of inquiry. But suppose one found in possession of stolen property should, in a proper inquiry as to how he came into such relation, reply, under oath, after great deliberation, and with legal counsel, that to answer the question would incriminate him. If the inquiry closed there, could it be affirmed that he came off with honor?

It is a well-known rule for weighing the strength of pleading to first consider what nature of case is proposed to be made out, and what character of relief is sought, and then to view the pleading, not by piecemeal, independently of the other parts,

but as a whole, giving each allegation its proper reference to and support by the whole narrative considered together.

It was not the possession and disposition by defendant of the fœtus, nor indeed his acknowledgment that, as a physician, he attended the mother who gave birth thereto, which constituted the *gravamen* of the charge of dishonorable, immoral, and unprofessional conduct; but it was his acknowledgment on oath, in a proper inquiry, after deliberation, and advice of counsel, that an investigation of the facts relating to said birth, including his conduct as attending physician, would criminate him. Such is the purport of his answer before the coroner's inquest, to avoid stating the name of the mother in question. The inquiry by the coroner was pointed directly to an investigation of the circumstances leading to the unnatural delivery, manifest by the facts shown. What could have followed disclosure of the mother's name? Simply an investigation of the facts and circumstances relating to the miscarriage. Such investigation, defendant admits, would not only tend to implicate him in malpractice and professional dishonor, but he says on oath, after deliberation, and advice of counsel, as the complaint shows, such investigation would criminate him.

Defendant's conduct as physician in relation to the subject of inquiry may have been entirely moral, honorable, and professional, but that affirmation cannot be maintained in view of his acknowledgment before the coroner's inquest.

The law, as mollified by the humane spirit of modern times, has not only dispensed with physicial torture to extort evidence of guilt, but also forbears to drive a witness to the more terrible stress of choosing betwen self-incrimination and perjury. But being brought into a position where appeal to the privilege of silence under such circumstances is necessary, because an answer would incriminate, does not signify honor. It signifies that the witness "prefers darkness rather than light" in respect to his conduct, "because his deeds are evil." It signifies that as between perjury, self-incrimination, and dishonor, by an acknowledgment that discovery or investigation of his deeds would lead to his incrimination, he chooses the dishonor cast upon him by that acknowledgment as the least of these hard alternatives. The law allows him the

privilege, and will not allow such acknowledgment to be used against him in a criminal prosecution, but does not at all undertake to shield him from the inevitable stigma of dishonor involved therein. Nor does the law forbid using such acknowledgment in cases not involving a criminal prosecution. (*Andrews* v. *Frye*, 104 Mass. 234.) The very fact that the law does not allow that acknowledgment to be used in a criminal prosecution shows how serious and weighty it is regarded. How, then, can it be affirmed that such acknowledgment is entirely consistent with innocence, honor, and morality? Nevertheless, the majority opinion holds that an entirely innocent man may have acted so, or that such action is entirely explicable on the hypothesis of innocence. Is that affirmation sound? Or can it stand against the inevitable deduction of the facts alleged in the complaint? Defendant said on oath, and with legal counsel, that investigation would incriminate him. The answer contradicts and repels the idea of innocent conduct on his part in respect to the subject of investigation. Who knew best what that investigation would reveal in respect to his conduct in the affair? If he had been entirely innocent, investigation of the facts would have shown it, and neither his honor nor liberty would have been jeopardized thereby. Would not every honorable physician, whose conduct had been innocent, have repelled with indignation even suspicion to the contrary, and invited investigation? But, on the contrary, defendant finds it necessary to ward off investigation. Why? Not to save some individual from annoyance of publicity, or even shame and disgrace in relation to the subject, but because, as he stated under oath, it would lead to his crimination. His answer was made under oath, after deliberation, and advice of counsel, and must be taken as true. It will not do to indulge the presumption, as seems to be done in the majority opinion, that his answer may have been untrue, and his conduct in reference to the subject sought to be investigated entirely innocent, because any such presumption is directly against the statement of defendant on oath, and would directly assume that he perjured himself thereby; such presumption, indulged in order to make room for the affirmation that defendant's conduct in reference to the subject of investigation by the coroner may

have been entirely innocent, involves defendant in perjury, and thus not only dishonor, but criminality; and such presumption would be set up contrary to defendant's statement, on oath, that investigation of his conduct would criminate him. Any other logical deduction seems to me, on careful consideration, impossible. Professional conduct which will not bear investigation without criminating the author of it must be dishonorable and unprofessional. It cannot be otherwise, and defendant can only clear himself of that implication of his own acknowledgment by showing two things in defense: 1. That his conduct as attending physician in relation to said premature birth was free from any practice which violated the criminal law of this state or the principles of morality and professional honor. That would show that his acknowledgment before the coroner's inquest that disclosure of the name of the mother would incriminate him was in fact untrue. 2. In order to escape from the guilt of perjury in thus answering at the coroner's inquest, under oath, he must show that he was led to such unfounded conclusion by misadvice, mistaken judgment, hallucination, or the like, which might relieve the statement of the character of willfully false testimony, and hence perjury. It would then appear to have emanated from misjudgment, probably occasioned or induced by erroneous advice. But all this is purely and entirely a matter of defense, and is not to be presumed against defendant's oath. The indulgence of any such presumption, or following a line of consideration or treatment of this case which implies such a presumption, is erroneous. No doubt the board of medical examiners and the learned judges of the district court saw clearly the situation, and the inevitable deductions which arose from the facts alleged in the complaint, and therefore held it sufficient, not as an arraignment for commission of a crime, with which the board had nothing to do, but as showing dishonorable, immoral, and unprofessional conduct on the part of defendant. I do not understand that the majority of this court deny that such conclusion must follow from the facts alleged in the complaint, as from the final excuse or explanation given by defendant of the reason why he thought this disclosure of the name of the mother would, under such circumstances as then existed,

criminate him; namely, because she had left the state, and was not subject to the jurisdiction of the courts. The majority of this court confess they cannot conceive how that fact would in any way have such effect on defendant as an innocent physician; but, nevertheless, they appear to lay great stress on that explanation in holding the complaint insufficient. Thus, the very fact in which no force can be found is made the controlling ground of decision. It is said defendant thought that circumstance augmented the chances of his crimination; and, although the very contrary is plainly true to a person of ordinary reason and experience (and he acted with advice of counsel) this explanation, which does not even possess the merit of superficial plausibility, is made the controlling and vital fact on which the decision turns. The departure of the mother left defendant a clear field to explain his "innocent conduct," without chance of the authorities obtaining contradiction from the mother, who of all others knew most intimately what his conduct was touching the affair under inquiry. It plainly lessened the chance of a guilty man being incriminated, instead of adding a circumstance to throw innocence into such fear. This assertion shows, when calmly examined, no more than a groping for some excuse or explanation to smooth down the way for the ugly acknowledgment which defendant was compelled to make. There is nothing of force in it, even if true, to frighten innocence into fear of crimination. If so, any physician called to administer to a patient who, from misfortune or weakness of nature, passes through an event of the character under consideration, and thereafter leaves the state, and the physician's conduct in respect to the miscarriage had been entirely innocent of crime, and honorable, moral, and professional, he must, nevertheless, if the event was about to be inquired into, seek to ward off such inquiry, even to swearing that it would criminate him, simply because the woman was absent from the state. This presupposes that the woman is to be entirely silent as to the facts and circumstances attending the event investigated, and that the conduct of the physician was free from any act criminal, unprofessional, or dishonorable; and he is left, in the absence of the woman, to assert and maintain his innocence. Under those circumstances,

how long would it likely take a physician in any community in this state, knowing his own innocence, and wishing to maintain his professional and personal honor, to make up his mind whether he would invite investigation, or suppress it by the serious declaration on oath that investigation would criminate him?

There has been considerable said in the majority opinion about the propriety of a physician maintaining silence in relation to events of the character under inquiry before the coroner, to shield the woman involved from annoyance, or even disgrace, which might follow publicity. We have nothing to do with that feature of the subject as a mere question of propriety; nor can it properly arise as a point for consideration in this case. No one can perjure himself for the sake of maintaining a point of propriety, at least cannot be presumed to have gone to that enormity with so small an excuse. If defendant had affirmed that personally he had nothing to fear from investigation, but declined to disclose the name of the mother on such ground, it might, with some pertinency perhaps, be introduced into this consideration; but defendant maintained no such ground for declining to further the inquiry by the coroner.

Counsel also pointed out that defendant's conduct in dallying on his oath, and changing his ground for answering the inquiry of the coroner as shown by the complaint, directly had the effect of hindering proper inquiry by the public magistrate, and this was urged as further showing dishonorable and unprofessional conduct on the part of defendant, who had been called as physician in the case. The answer made to this argument, in the opinion of this court, is that such effect of defendant's conduct is abundantly asserted in argument, but not in the complaint. To require that the pleader, after stating the facts constituting a cause of action, shall also append a statement of deductions which flow directly as consequences from those facts, contradicts and reverses many of the fundamental principles of legal pleading, and especially the rule forbidding the pleader to state the conclusions deducible from facts, but requires the statement of the facts, and leaves the ultimate con-

clusion as to the effect of such facts to be determined by the court.

The case seems, without hesitation, to have been classified as one of criminal characteristics and nature.  I gravely doubt the correctness of this.  It does not involve punishment by either fine or imprisonment.  It involves forfeiture of a special privilege, the tenure of which depends on moral, honorable, and professional behavior.  The forfeiture of a privilege or special license, or indeed an office for lack of qualification to hold it, is not generally considered, as I understand, in the nature of criminal punishment.  Nor is a proceeding in the nature of *quo warranto*, attended only by finding of disqualification and disbarment from a privilege or franchise, considered a criminal proceeding, as used in modern practice.