**HATCH v. OOMS, Commissioner of Patents.**

**DORSEY v. SAME.**

**CARTER v. SAME.**

**Civil Actions Nos. 29517, 29528, 29530.**

District Court of the United States for the District of Columbia.

Jan. 23, 1947.

Edgar J. Goodrich, of Washington, D. C., and Albert C. Hirsch, of Pittsburgh, Pa., for petitioner Roswell F. Hatch.

William E. Leahy, of Washington, D. C., for the petitioner Vernon M. Dorsey.

Covington, Burling, Rublee, Acheson & Shorb, Spencer Gordon, and Charles A. Horsky, all of Washington, D. C., for petitioner Henry W. Carter.

Jo. Bailey Brown, of Pittsburgh, Pa., and E. L. Reynolds, of Washington, D. C., for respondent.

MORRIS, Justice.

These proceedings were brought in this Court pursuant to Section 11, Title 35 U. S.C.A., and Rule 95, Title VIII of the Rules of this Court to review Orders Nos. 3937, 3938 and 3939 of Conway P. Coe, Commissioner of Patents, all dated May 18, 1945, disbarring from practice before the United States Patent Office for gross misconduct the petitioners Henry W. Carter, Vernon M. Dorsey and Roswell F. Hatch, respectively. The respondent in these proceedings here is the successor in office to the Commissioner of Patents whose action is sought to be reviewed. Upon motion of each petitioner, the order of disbarment was stayed by orders of this Court entered the 16th day of July 1945 pending review and final determination by this Court. By stipulation Volumes I, II and III of the printed record, containing testimony and printed exhibits, and numerous other exhibits, together with briefs of counsel, transcript of arguments of counsel, a photostat copy of report of Committee on Enrollment and Disbarment, opinion of Commissioner and copy of orders of disbarment were transmitted to this Court in lieu of a formally certified record of the proceedings in the Patent Office. Argument on the petitions for review commenced February 4, 1946, and consumed five days. Prior to arguments briefs for all parties were submitted and subsequent to the arguments a transcript thereof was received by the Court.

The proceedings in the Patent Office were initiated by a rule to show cause, directed to each of the petitioners, which read as follows:

"Whereas it was found by the Supreme Court of the United States in its decision in the case of Hazel-Atlas Glass Company v. Hartford-Empire Company, 1944, 322 U.S. 238, 64 S.Ct. 997, 88 L.Ed. 1250, that fraud was practiced on the United States Patent Office during the prosecution of the patent application of Karl E. Peiler, No. 294792, which matured into patent No. 1,-655,391 on January 3, 1928, which fraud consisted in the preparation and presentation to the United States Patent Office of an article entitled 'Introduction of Automatic Glass Working Machinery; How Received by Organized Labor,' naming one William P. Clarke as the author, who in fact was not the author of said article, and

"Whereas it appears from said decision and the record of the case before the Supreme Court, and the record before the United States Circuit Court of Appeals, Third Circuit, in the case of Hartford-Empire Company v. Hazel-Atlas Glass Company, 137 F.2d 764, and the record before the District Court, Northern District of Ohio, West. Div., in the case of United States v. Hartford-Empire Company, 46 F.Supp. 541, and the records of the Patent Office, that you participated in the preparation of said article and/or the presentation

thereof to the United States Patent Office during the prosecution of said patent application knowing that said article was not written by said William P. Clarke, and with the purpose of deceiving the Patent Office as to the authorship of said article and influencing the action of the Patent Office on said application; and that you thereby perpetrated or participated in the perpetration of a fraud on the United States Patent Office.

"Now therefore, you are hereby ordered to show cause on or before November 9, 1944 why, in view of the above, you should not be suspended or excluded from further practice before the United States Patent Office for gross misconduct.

"You are hereby notified that a hearing on this order to show cause will be accorded to you before the Committee on Enrollment and Disbarment of the United States Patent Office on November 9, 1944 in Room 1035 of the United States Patent Office in the Department of Commerce, 14th and E Streets, N.W., Washington, D.C., beginning at 10:00 A. M. on said date."

In addition to the three petitioners in these proceedings, who were designated as respondents in the proceedings in the Patent Office, there was another respondent, Robson D. Brown, who is now deceased.

A hearing was had before the Committee on Enrollment and Disbarment of the Patent Office, consisting of seven members, such hearing commencing November 21, 1944, and consuming five days with one night session. Each of the respondents were represented by counsel, excepting Mr. Vernon M. Dorsey, who appeared pro se. On March 27, 1945, oral argument was heard by the Committee, with Commissioner Conway P. Coe attending. The Committee, in its report to the Commissioner of Patents, dated April 26, 1945, which discussed much of the evidence in the case and set out many excerpts therefrom, stated (all members agreeing):

"As is clear from what has been stated in this report, it is our carefully considered opinion that the record made before us indubitably and conclusively shows and establishes that the respondents and each of them has been guilty of gross misconduct toward the Patent Office in connection with the so-called Clarke article, the most salient points of said misconduct being: First, the preparation and the presentation of the article to the Patent Office in such manner as to induce the Patent Office officials to believe that the article compared the commercial success of the specific invention of the Peiler application with the commercial success of the Owens machines, whereas, in truth, the comparison was of the commercial success of gob feeding machines in general—of which there were several types other than Peiler's—with the commercial success of the Owens machines; and, Secondly, the deliberate concealment from the Patent Office of the facts that (a) the so-called Clarke article was prepared by and on. behalf of Hartford; (b) that the sponsorship of the article by Clarke and the notation thereon of Clarke's name as author was procured by and on behalf of Hartford, and (c) that the publication of the article in the National Glass Budget was procured by Hartford and on its behalf through Hatch. We hold and believe that in the perpetration of such concealment all of the respondents deliberately collaborated not only with each other but also directly or indirectly with Clarke, and that all of the respondents connived with each other with the intention of misleading and deceiving the officials of the Patent Office as to the true state of the said material facts concerning the connection of Hartford with the preparation and publishing of the article with Clarke's name appearing thereon as the author thereof, when in fact he was not the true author thereof, and all this for the purpose of securing favorable action by the Patent Office with respect to the claims in the Peiler application."

In its recommendation five members recommended disbarment and two members recommended that "respondents be not disbarred perpetually from practice before the Patent Office but that instead respondents and each of them be suspended from practice for a definite period of time, for instance, up to one year." The Commissioner of Patents on May 18, 1945, addressed the following memorandum opin-

792

ion to all counsel and to Mr. Dorsey, who had appeared pro se:

"An order to show cause why he should not be disbarred from practice before the United States Patent Office was issued against each of the above named respondents. Answers were filed and a hearing had before the Committee on Enrollment and Disbarment of the Patent Office, at which time testimony and exhibits were introduced by the respondents. The Committee has made its report to me and in the report a majority of the Committee has recommended that all of the respondents be disbarred from practice before the Patent Office. A copy of the report is transmitted herewith.

"That a fraud was practiced on the Patent Office, as charged in the orders to show cause, was found by the Supreme Court of the United States in the case of Hazel-Atlas Company v. Hartford-Empire Co., 322 U.S. 238, 64 S.Ct. 997, 88 L.Ed. 1250, which was a suit to set aside the judgment of the Court of Appeals for the Third Circuit sustaining the validity of the Peiler patent No. 1,655,391, which was granted on the Peiler application referred to in the orders to show cause.

"In its Opinion in that case the Supreme Court said:

" 'Here even if we consider nothing but Hartford's admission, we find a deliberately planned and carefully executed scheme to defraud not only the Patent Office but the Circuit Court of Appeals.'

"I have given careful consideration to the Committee's report and to the entire record made at the hearing and I am convinced that each of the above named respondents participated in the scheme to defraud the Patent Office, as was found by the Committee, and I approve the recommendation of the majority of the Committee, that each of the respondents be disbarred from further practice before the United States Patent Office. Orders of disbarment have this day been issued."

Each of the petitioners here assigned a great many errors, all of which have been carefully considered. It would enlarge this opinion beyond reasonable limits to undertake to deal separately with each of such assigned errors. I shall undertake to discuss such matters as have been pressed in the briefs and oral arguments which seem to me necessary in the proper disposition on review of these proceedings.

■ At the outset it is of first importance to make clear the function of this Court in the present proceedings. It is not that of the trier of the facts; it is to review what has been done in the disbarment proceedings and to determine whether or not the petitioners have had a fair hearing after due notice of the charge each was called upon to answer, and whether or not there is substantial evidence to support the action of the Commissioner of Patents.

■ . Each of the petitioners contended that improper consideration was given to the several decisions and records in the cases mentioned in the rules to show cause, in which they were not parties. I am in complete agreement with the proposition that they cannot be found guilty of gross misconduct upon any evidence in any of such cases unless such evidence has been properly admitted in evidence in these proceedings. The critical part of the evidence found in the records of the other cases and introduced into evidence in the present proceedings consists of communications written or received by the several petitioners, and as to such communications it has been conceded that they were written by the persons by whom they purport to have been written, and were received by the persons to whom they were addressed. There is, therefore, no question as to the proper admission of such communications against the writers thereof, or as showing knowledge of the matters therein contained on the part of those who received such communications. Of course, it follows that the trier of the facts could draw reasonable and legitimate inferences from these facts so established.

■ I furthermore agree with petitioners that conclusions or findings by the courts in the cases mentioned are not a determination of any issue in these proceedings. It was for this reason that I considered the question should be resolved as to whether or not, in view of the recitation by the Commissioner of the findings by the Supreme

Court in the case of Hazel-Atlas Co. v. Hartford Empire Co., the Commissioner himself had reached the conclusion that a scheme to defraud the Patent Office existed, or merely relied upon the findings of the Supreme Court that it did. There can be no doubt that the Committee did make a finding to that effect. I therefore, addressed identic questions by letter to counsel for all parties herein, and by their several replies by letter and at a further hearing held October 24, 1946, they stated that in effect the action of the Commissioner of Patents was an implicit approval and adoption of the findings of the Committee, and no further action on his part was necessary to the final disposition of these cases on review.

Application Serial No. 294,792, filed by K. E. Peiler in the Patent Office May 5, 1919, sought a patent for a method of and apparatus for feeding molten glass. This application, with many vicissitudes, delays and numerous interference proceedings finally eventuated in the issuance of patent No. 1,655,391, dated January 3, 1928, to the assignee Hartford Empire Company. One after the other of the patents or alleged prior claims asserted in interference with the Peiler application were acquired by the Hartford Empire Company, and such interferences were terminated, as they were no longer of an adversary nature. The question of patentability, however, remained. Accompanying an amendment, dated October 11, 1926, there was filed, among other things, an article entitled "Introduction of Automatic Glass Working Machinery; How Received by Organized Labor, by William P. Clarke, President, American Flint Glass Workers' Union," which had been published in the National Glass Budget, a trade publication, July 17, 1926. This article undertook to show how automatic and semi-automatic machinery had increasingly displaced skilled workers in the glass industry; how it had been the policy of the union leaders to encourage such workers to acquire skill to operate the machines which were displacing the skills which they had and thus prevent their unemployment. Excerpts from reports of its officers to the Bottle Blowers' Association constitute much of the material of the article. As the reports used the term "Owens or automatic machines" to designate the automatic feeding accomplished by suction of molten glass into the molds and "flowing or pouring devices" to designate all other types of automatic or semi-automatic feeding, the article deals with some emphasis on the difference between flowing or pouring devices and gob feeding. The distinction is stated in the article as follows:

"Instead of employing a stream of glass which collects in the mold until the desired mold charge had accumulated, these new feeders cut off a suspended chunk or gob of glass which was pre-formed during suspension to correspond, to some extent, at least, to the shape of the mold cavity in which it was to be received."

The article states that such gob feeders had been put out by a number of manufacturers, including the Hartford-Fairmont Company, George E. Howard, Tucker and Reeves, W. J. Miller, and others. Excerpts from the reports aboved mentioned, as interpreted by comment in the article and shown by a chart, undertook to show that the production on gob feeders, which commenced in 1917, rose with great acceleration to the close of 1925, whereas production on Owens machines, which commenced in 1905, rose until the middle of 1919 and then leveled off.

The evidence respecting the preparation, publication and filing of the Clarke article is voluminous. Such parts of it as appear to be critical in showing connection of the several petitioners with the preparation of said article, or with the filing thereof, and its purpose are quoted in the report of the Committee and, therefore, need not be set forth in full here. Each petitioner insists that this evidence does not show any wrongful act or intent on his part, and there is much testimony on behalf of petitioners denying any inferences drawn from such evidence that they were guilty of any misconduct in connection with the Clarke article. A discussion and correspondence was had between Brown and Carter in December 1925 with respect to the desirability of having an article describing the revolution produced in the glass business by the plunger gob feeding system. Brown suggested that such an article would be helpful

in making a record before the Patent Office in connection with the principal Steimer case and also "in our Peiler plunger case, where we hope to obtain claims covering the broad ideas of keeping suspended mold charges shaped by the action of a plunger." He suggested that Carter write such article. Carter declined, as he did not have first-hand knowledge of the industry until 1921 and then only from the viewpoint of the patent specialist. He suggested that the article be written by Howard, who had written previous articles which were published in one of the glass journals. It is insisted in the testimony by Brown before the Committee that the article which he suggested finally became the Peiler affidavit, which dealt in detail with the various mechanical developments in the glass industry, and which was filed in the Patent Office, and had no reference to the Clarke article which was filed at the same time. In this connection, it is to be noted that Brown was resident patent counsel for Hartford and Carter was an official of the Owens Bottle Company, subsequently the Owens-Illinois Glass Company, which had a plunger licensing agreement with Hartford, whereby it had the right to use Hartford's feeder patents and to share in royalties from licenses.

Hatch, who was employed by Hartford, and had charge of the Invention Department, "which was primarily the contact between the engineers and the patent attorneys, and a number of other duties that went with it," had a conversation "not far from the beginning of 1926 and maybe a little before, or probably a little later" with Brown and secured authority to prepare an article which developed into the Clarke article. Both Hatch and Brown denied that at this time there was any intention to use such article, which was to be based upon reports of the Bottle Blowers' Union, in any patent proceedings. During the preparation of a draft by Hatch, he sought and received information from Carter, who in May 1926 advised the president of his company that Hatch had prepared the article "with the idea of getting it printed under the name of some apparently unprejudiced authority and then calling the attention of the Patent Office Examiner to the article as published

in the belief that the examiner will thereby be influenced to a more favorable consideration of Hartford's broad claims." In that memorandum Carter also stated, "Of course, we are equally interested with Hartford in securing these broad claims and, therefore, indirectly interested in getting the article published." The intention of Hatch originally was to submit the article to a Mr. Maloney, President of the Bottle Blowers' Association to sponsor it for publication, but when Mr. Maloney declined on the ground that it might involve him with other glass manufacturers, Hatch sought to secure such sponsorship by Clarke, President of the American Flint Glass Workers' Union. Clarke would not agree unless the Owens Company, which he did not wish to offend, was agreeable thereto. In the memorandum of May 25, 1926, above referred to, Carter advised agreement with the article so that it would be sponsored by Clarke. Clarke was later advised that the Owens Company had no objection, and he agreed to go over the article, make such changes as he thought necessary, and sign it for publication.

Hatch emphatically denies that he had ever told Carter that the article prepared by him was for the purpose stated in Carter's memorandum, and Carter in his testimony admits that he has no recollection that Hatch did so, and probably had the understanding about its purpose which he did from the correspondence which he had originally had with Brown. Hatch did, however, write to Carter on March 30, 1926, in which letter, among other things, he stated that he was enclosing a carbon copy of the article which he had been preparing for publication and:

"The latest idea we have here is to persuade Mr. Maloney, the president of the Bottle Blowers' Association, to sponsor this article. I have become fairly well acquainted with him, and I think there is a reasonable chance that he will do as we wish. Of course, we do not care who assumes the authorship of the article, but we want some one not associated in any way with either of our companies, and whose name would carry some slight weight in the glass trade."

In his letter to Carter of April 19, 1926, Hatch stated, among other things:

"The point I have in mind is that, if I can get the president of the association to publish this, I thought that he should base all of his statements on their printed records, except where such statements had a direct bearing on the particular point which we wished to bring out."

And further in said letter:

"Of course, I think you understand that the whole object of the article is to make an excuse to get the production curves and a few statements in regard to gob feeding into print."

Prior to the time that Maloney was asked to sponsor the article and declined to do so, Hatch had furnished a draft of the article to Dorsey, who was associated with Brown to actively prosecute the Peiler application. This was sometime in April 1926. Dorsey read the article and made only a slight change, probably two words, and returned it to Hatch. Dorsey knew that Hatch intended to ask Maloney to sign the article. Subsequently, he wired Hatch for a copy, to which Hatch replied by letter, stating that Maloney had declined to sign the article, and he had then approached Clarke. Hatch stated in that letter, among other things:

"Mr. Clarke also swallowed the labor bait which I had prepared for him and said he would be glad to revise and publish the article over his own signature if I would get assurance for him that the Owens Company would not be offended. * * *

"Clarke said that he would rewrite the article to a considerable extent, I suspect, and publish it in the Trade Journals. I fear I may have to go out to Toledo again to get Clarke to show some speed in this matter and perhaps to supervise what he publishes. I think he understood just what we want published, but he might unintentionally destroy some of the propaganda which we planned.

"I will see that you get a copy of some Journal in which this article appears when it comes out."

After ascertaining from Maloney that he had no objection to the publication of the article, Clarke informed Hatch by telegram dated July 7, 1926, that he would "sponsor article with very slight alteration and modifications." Clarke signed the article with such slight alteration and modification sometime the next day and handed it to Hatch, who was then in Philadelphia. On July 9, 1926, Hatch wrote to Mr. Kimes, Editor of the National Glass Budget, respecting the publication of this article, in which letter he said, among other things:

"This article is prepared by Wm. P. Clarke, President of the American Glass Workers' Union. * * *

"We would like to have the article appear as soon as possible and I think that Mr. Clarke will not insist on seeing a proof if it is going to take extra time.

"* * * You will understand that we do not want to have any unnecessary connection with this article as it is presented wholly as the statement and opinion of Mr. Clarke. If there will be any expense in connection with this, please let us know what it will be."

Hatch again wrote Mr. Kimes on July 14, 1926, in which he stated, among other things:

"I have taken the matter of the reprints up with Mr. Brown, and we have decided that probably the original publications will carry a little more weight than a reprint. Therefore, we would like to have you send us fifty additional copies, making 100 in all."

Hatch, in his testimony, insists that at no time until a few days before the date last mentioned did he know that the Clarke article was to be filed in the Patent Office; that he did know it then, as Brown had told him that it would be so used, and it was for that reason that he used the language "the original publication will carry more weight than a reprint." He secured a copy with an attached affidavit of Mr. Kimes, dated October 8, 1926, which was forwarded by Brown to Dorsey with a letter transmitting the article and certain affidavits "intended to lay before the Patent Office certain material facts relating to the development of the type of glass feeders to which this application relates, as well as certain facts bearing upon the prior art references." This letter of transmittal to the Patent Office discusses the af-

fidavits which were transmitted with it, and refers to the Clarke article as an "interesting account of the introduction of automatic glass machinery and its reception by labor unions," stating:

"It describes the various steps by which automatic machinery was introduced, the revolution in the art accomplished by the Owens machine, the somewhat temporary effect of flow-feeding devices, and the further revolution in the art produced by the suspended-charge feeders referred to in the Clarke article as 'gob feeders.'"

Several excerpts from the Clarke article are quoted, including the distinction made therein between "flowing and pouring devices" and "gob feeding" (already quoted in this opinion), and finally the following one:

"Disregarding, for the present, the first use of machinery in making bottles, and considering only the sudden and alarming introduction of revolutionary devices, the Bottle Blowers' Association has twice been confronted with mechanism which superseded a large amount of hand labor at each time. These crises were, first, the Owens machine, second, by gob feeders.

"At the present time, the bottle production of the country from automatic machinery is produced almost entirely by Owens machines and gob feeders and, as is shown on the chart, practically all of the annual increase in production is being made on gob feeders."

The final paragraph of the letter of transmittal reads:

"The conclusion of the whole matter is that the suspended-charge feeder has accomplished a revolution in the glass art, that it operates on principles not disclosed in the patents of the prior art, and that many of the features contributing to the success of the suspended-charge feeders are set forth in the claims of this case. It is submitted, therefore, that these claims are entitled to favorable consideration, which is respectfully solicited."

This letter of transmittal was signed by Dorsey and filed in the Patent Office October 12, 1926.

In a brief, signed by both Brown and Dorsey, in the Board of Appeals of the United States Patent Office, under the caption "The Last Step Wins and Commercial Success is Persuasive of Invention," an argument is made and excerpts from adjudicated cases quoted on the weight that should be given to commercial success. Then the following comments respecting the Clarke article are made:

"That the appellant's feeders have been a tremendous success and have revolutionized the art from the standpoint of economy is recognized by reluctant witnesses. We call attention to the article by William P. Clarke, President of the Flint Glass Workers' Union (a union whose members have been displaced by the feeders in question), and published in the National Glass Budget for July 17, 1926, which is an exhibit in this case. (See Appendix, page 76.) Clarke in the exhibit in question gives a graph showing the rapid acceptance of suspended-charge feeders which he terms 'gob feeders' and stresses the great displacement of manual workers occasioned thereby. Heintzelman, an experienced manufacturer of thirty-five years' experience (See Appendix, pages 69 and 73), states that there have been revolutions in the glass feeding art in those years. The first was the introduction of the Owens' machine before alluded to, and the second was the introduction of appellant's suspended-charge feeders. The graph of Clarke shows how the introduction of the suspended-charge feeders prevented further introduction of Owens' machines."

The Clarke article, which had previously been filed, among other documents, was printed in the appendix to said brief.

On November 4, 1927, the Board of Appeals affirmed the decision of the Examiner and held the claims on appeal unpatentable over prior art references. A motion for rehearing was granted November 11, 1927, and a brief signed by Dorsey was filed December 2, 1927, to which was attached certain documents, including an affidavit of Peiler, swearing back the date of his invention prior to July 22, 1916, date of the application of the Howard patent, an affidavit of William H. Honiss, explaining the delay in the filing of the Peiler application, and an affidavit of Howard, explaining a

"disclaimer" in his patent, which had been acquired by Hartford, in which he referred to the use of a plunger in one of the old methods. Thereafter, on December 6, 1927, the Examiner was reversed and the invention held patentable with respect to all but two claims. The patent for the allowed claims issued January 3, 1928, as has already been stated.

■ All events subsequent to this are to be considered only as they may throw light upon the acts of the petitioners and their intent with respect to the Clarke article up to this point. Such subsequent acts may not in themselves be the basis for any charge of deception on their part practiced upon the Patent Office.

In June following the issuance of the Peiler patent, Hartford sued Hazel-Atlas Glass Company in the District Court for the Western District of Pennsylvania for infringement. In that case the court held that the prior disclosures precluded invention by Peiler of everything but the means by which the operation of the plunger or needle could be changed and adjusted *during its operation,* a feature which was not in that court's view anticipated by prior disclosures. Thus limited, the court did not consider that Hazel-Atlas had infringed the Peiler patent. While the file wrapper was introduced in evidence in that case, no consideration or comment was made either by counsel or the court of the Clarke article. An appeal was taken by Hartford to the Circuit Court of Appeals for the Third Circuit. In the brief in that appeal by Hartford, the following is stated under the subheading "Commercial Results of This Invention:"

"We shall now point out some of the facts of record as to the commercial results of the invention of the Peiler patent.

\*    \*    \*    \*    \*    \*

"2. *It Broke the Owens Domination.* The article by Mr. William Clarke, former President of the Glass Workers' Union (Rec. V 592 et seq.), gives an admirable outline of the effect of the Peiler plunger feeder on the Owens machine business. His chart reproduced opposite this page (Rec. V 602), showing the production curves of the two types of machine, speaks for itself.

The Owens production line begins at zero in 1905 and goes to its high point of 12 million gross in 1919. Alongside of it the 'gob feed' (suspended charge feed) production curve begins at zero in 1917 and goes to 9 million gross in 1925. The Owens curve practically ceases to rise after 1919, that is, as soon as there was substantially competitive production by the suspended charge or 'gob' feeders.

"In fact, the Owens Company itself began the use of the reciprocating plunger feeder in 1920 (Rec. I, 289). *It is now an important licensee of the plaintiff's plunger feeders* (Rec. I, 237, 289), using them in different plants (Rec. I, 289, 291). The Owens Company, the largest glass producer in the country, was forced 'by the hard facts of actual commercial competition' to recognize Peiler's system as a radical advance (Rec. V, 682, 603) [sic]."

The chart shown in the Clarke article is reproduced in the brief, as stated in the foregoing quotation.

While not the counsel who made oral argument on appeal, both Dorsey and Brown were of counsel and signed the brief. This appeal was heard before Circuit Judges Buffington, Woolley and Davis, and decided May 5, 1932. Judge Buffington wrote the opinion for the Court, Judge Woolley writing a dissenting opinion. The majority sustained the broad claims of the Peiler patent and reversed the decision of the District Court. Judge Buffington traced the development of the glass industry, particularly the manufacture of narrow-neck bottle ware, from the hand method using the pontil or punty to gather the molten glass and keep it in suspension by the manipulation of the punty until it was deposited in the mold and sheared by another workman. He used matter contained in the Peiler affidavit and in the Clarke article to show that the first efforts to mechanize the manufacture of such glass ware required a very much higher temperature and fluidity of the glass rather than the lower temperature and viscosity which were characteristic of the hand-punty method. The pouring or flow methods had defects which were, however, largely overcome by the Owens suction method. The Owens machine was so ex-

pensive, and licenses to use them were so limited, that all but the largest manufacturers were threatened with extinction and their employees with unemployment. Judge Buffington attributed to Peiler the first and only successful method of employing mechanical means to utilize the characteristics of the glass which it had when used by the hand-punty method. Turning to the machine covered by the patent under consideration, he made the following comment:

"This new machine and its new and differentiating elements were tersely stated in such [Clarke] article as follows: *'Instead of employing a stream of glass which collected in the mold until the desired mold charge had accumulated, these new feeders cut off a suspended chunk or gob of glass which was pre-formed during suspension to correspond, to some extent, at least, to the shape of the mold cavity in which it was to be received.'*

"We shall later see that in these few words this practical glass blower official summarized the novel characteristics of the machine which is the subject-matter of this suit. And be it observed, he notes the exact differences between Owens and this new machine. Owens uses a stream of flowing glass, which means high heat and great fluidity. The new machine uses a suspended gob, pre-formed during suspension and so pre-formed as to conform to mold shape, all of which means viscosity, nonfluidity, and less heat. It also notes that these things were done while the gob was *suspended.*"

Judge Buffington traces the steps by which, in his opinion, Peiler had arrived at the development of the machine covered by the instant patent. There was first the paddle feeder by which a chunk or gob of viscous glass was forced over a lip of the container and sheared so as to fall in a mold. While this predetermined the quantity of glass constituting the gob, it could not preform it to a desired shape corresponding to the mold cavity. This was overcome by having a gob, after it was shoved over the lip of the container, fall into a connected container with a submerged orifice, the flow from such orifice being controlled by a reciprocating plunger which had the effect

of pre-forming the gob so as to correspond, to some extent at least, with the cavity of the mold, and later the machine covered by the patent under consideration wherein the paddle was dispensed with, but the submerged orifice and reciprocating plunger retained. Judge Buffington concludes this part of his opinion with the following statement:

"The periodic, separated, individualized mold forms or gobs discharged by this current-intercepted process and its contrast with the continuous feed stream of the earlier art are described by the union official just referred to in language we now repeat and whose keen accuracy will be better appreciated from what has been shown in the intervening part of this opinion. Accordingly we repeat his words: *'Instead of employing a stream of glass which collected in the mold until the desired mold charge had accumulated, these new feeders cut off a suspended chunk or gob of glass which was pre-formed during suspension to correspond, to some extent, at least, to the shape of the mold cavity in which it was to be received'.*"

In addition to the quotations above mentioned, Judge Buffington quoted numerous other excerpts from the Clarke article in his opinion.

Judge Woolley, in his dissenting opinion, made no reference to the Clarke article, but agreed with the District Court that all of the broad claims of Peiler had been anticipated in the prior art. He did agree with the District Court as to the validity of the narrow claim mentioned in discussion of the District Court's opinion.

Shortly after the publication of the Clarke article in the Glass Budget, a Mr. William Wood, now deceased, an attorney representing the interests of the Nivison-Weiskopf Company which was manufacturing certain molten glass feeding machines which the Hartford Company claimed were infringing the Peiler paddle-needle feeder patent and other patents owned by it, wrote Clarke and later called on him for the purpose of getting certain information which he hoped would be useful in suits then pending or threatened. Clarke testified in substance that he told him of Hatch's connec-

tion with the article, "but that it was my article." Hatch learned of this visit when he visited Clarke in Toledo on February 21, 1927, and he wrote a memorandum to Brown dated February 26, 1927, in which the following is stated:

"After getting this information, Mr. Clarke told Mr. Wood the whole history of this article, i. e., that I furnished at least some of the information, and that I assisted him in preparing the article. I do not know the exact extent to which Mr. Clarke ascribed the article to me.

"In any event, he told Mr. Wood that he could get additional information by applying to me, and naturally I have heard nothing from Mr. Wood.

"This incident was reported to Mr. Carter of the Owens Bottle Company and to Mr. Brown on February 21, 1927."

Shortly after the decision and opinions in the Hazel-Atlas case on May 5, 1932, J. S. McCarthy called on Clarke and presented a letter of introduction from Mr. Wood. McCarthy sought information respecting the Clarke article and, either on that day or on May 24th when he returned to see Clarke, requested a photostat copy of the original article and an affidavit respecting its authorship. Clarke, in his testimony, stated that he did not like his manner and told him he would not furnish either unless summoned to court, in which event he would tell the truth. About this time Hatch sought to secure a photostat copy of the signed article, which had been returned to Clarke by the Glass Budget, and to secure from him an affidavit. Both of these were given to Hatch on May 24, 1932, in which affidavit Clarke stated that the Clarke article was published by his authority and over his signature; that, before he signed the article and released it for publication, he gave the statements set forth therein careful consideration and knew them to be true; that he signed said article and released it for publication without remuneration in the belief that a correct historical statement of the facts set forth in said article would be of interest to the glass industry. Following this Hatch wrote to Carter on May 28, 1932, as follows:

"Your information on my visit to Toledo has been rather brief, I imagine, and I thought you might like to have a little more detailed report.

"I want to state most emphatically that Mr. Clarke has fully lived up to the statement I made about him, to the effect that he was absolutely honest and trustworthy in every respect. He has been of great assistance to us, and I believe that we are in a most satisfactory position. It does not seem wise to distribute copies of all of the papers I have, or to go into much detail in correspondence, but as you know, everything that I have is at your service if you need it.

"The assistance which you gave me the morning I arrived in Toledo was very useful, and I had to call on Mr. Naylor several times afterward. His assistance, like your own, was quite necessary.

"We are quite indebted to Mr. Clarke. While it is true that he has done nothing beyond what would be expected of any reputable man, nevertheless, without violating any confidence or doing anything of a questionable nature, he might easily have caused us a lot of trouble. This should not be forgotten, and I would like to have a general statement to this effect brought to the personal attention of Mr. Lewis.

"I have a lot of interesting things to tell you the next time I have a chance to talk to you."

On July 15, 1932, Hatch was advised by telegram from Carter that Clarke had failed to be re-elected as president of his union. Hatch wired Clarke of his regret and sought to arrange a meeting with him, which meeting was held in Toledo on July 22, 1932. Hatch, in his testimony, stated that Clarke told him about failing in his re-election, that litigation was pending against him, and that he was in a very serious financial situation and needed financial assistance, which he thought he was entitled to from Hartford in view of work which he had done in the past, and which had extended at intervals from 1925, or earlier, to 1932; that he had been put to a lot of annoyance by the activities of McCarthy; and that he had never received anything for the

time put in on the Clarke article. He also stated that one of the reasons for losing the election was due to the union's objection to his having anything to do with Hartford. Hatch stated that he thought there was something in what Clarke said and that he had considerable sympathy for him. Clarke said he needed $10,000 and Hatch told him he thought that was a little bit high, but would take the matter up with his company. He did and was instructed by Brown not to make any commitment to Clarke until Hatch had seen Carter, which Hatch said he did, saying Carter agreed that a substantial amount should be paid to Clarke. Hatch stated that Brown thought Clarke should be paid something, but thought $10,000 was too much and wanted Hatch to see if he "couldn't beat him down some." Hatch finally agreed on $8,000, $500 of which was paid by Hatch to Clarke in New York on August 4, 1932, and the balance of $7500 in Pittsburgh on August 11, 1932. At that time Clarke signed a retainer agreement for a period of five years, giving Hartford the right to his services at an agreed compensation of $25 a day for such days as Clarke "shall at the written directions of Hartford spend in compiling data, making investigations and/or reports and testifying regarding the same." It was provided in said instrument that Clarke should not be called upon or required to render such services at times when it will interfere with other regular employment that he may have. All money was paid to Clarke in cash. The explanation for this is that any payment by check would have resulted in the money being seized by Clarke's creditors. The payments made by Hartford were charged to the accounts which were shared by Owens so that each could pay half. Clarke treated the payments as a gift and so returned them in his income tax return.

Following the decision and opinions in the Hazel-Atlas case on May 5, 1932, several motions were made extending time for motions for rehearing, during which time negotiations were being carried on which resulted in a settlement of that litigation whereby Hazel-Atlas paid to Hartford, in which Owens shared, $1,000,000, and licensing agreements were made. Announcement of this settlement was made through trade papers on or about July 22, 1932. Carter, in his testimony, said that he did not authorize any particular payment of money to Clarke, though the matter had been mentioned to him, and he thought it was right in view of the value which the article had in Judge Buffington's opinion and the settlement which had been made of that suit, which resulted in the payment of $1,000,000, and would result in the payment of several millions more. There is nothing in the evidence that connects Dorsey with the payment of any money to Clarke.

On May 31, 1933, Hartford instituted a suit against Shawkee Manufacturing Company for infringement, which resulted in a decision in favor of Hartford under the ruling in the Hazel-Atlas case. During the pendency of this case on appeal certain communications were sent to Judge Buffington by counsel for Shawkee, showing by letters from Hatch to the National Glass Budget and by the National Glass Budget to Clarke that the Clarke article had been published at the "instigation" of Hartford. Letters were also written to Judge Buffington by counsel for Hartford, who took the position then, as counsel for petitioners do in the present proceedings, that all statements in the Clarke article are true and that, therefore, no fraud had been committed by the use of the Clarke article in the Patent Office or before the Court. Numerous petitions were filed by Shawkee for leave to file various amendments and bills of review, all of which were denied, and petitions for certiorari were likewise denied.

A suit by the Government against the Hartford Empire Company, Owens Illinois Glass Company, Hazel-Atlas Glass Company, and several other glass companies, charging violation of the Sherman Anti-Trust Act, as amended, 15 U.S.C.A. §§ 1-7, 15 note, was commenced on December 11, 1939. During the course of that trial, much, if not substantially all, of the documentary evidence upon which the respondent in these proceedings rely first became known or available to the Patent Office. While all of the petitioners herein gave evidence in that case, either by testimony or affidavit, none of them were parties, and, of course,

as has been said, are not bound by the findings of fact or conclusions of law made therein. The decision in that case was rendered August 25, 1942, adverse to the defendants, which was affirmed on appeal by the Supreme Court January 8, 1945.

Predicated upon information and evidence which had been made available during the trial of the anti-trust suit, Shawkee, on October 24, 1941, and Hazel-Atlas, on November 19, 1941, filed petitions in the Circuit Court of Appeals for leave to file bills of review. Such petitions, as amended, asking the Circuit Court of Appeals to set aside their judgments on the ground of fraud, were denied, Judge Biggs dissenting. The Supreme Court on certiorari, May 15, 1944, reversed the action of the Circuit Court of Appeals in the Hazel-Atlas case, and directed that Court to set aside its judgment of May 5, 1932. Action of similar effect was taken by the Supreme Court in the case of Shawkee Mfg. Co. v. Hartford-Empire Co., 322 U.S. 271, 64 S. Ct. 1014, 88 L.Ed. 1269.

The Commissioner of Patents has determined that the use in the Patent Office of the Clarke article for the purpose of influencing action on the Peiler application, prepared and published, as it was, without disclosing the participation of persons interested in the allowance of Peiler's broad claims in its preparation, was a deception practiced upon the Patent Office. He has further determined that the petitioners, registered practitioners in the Patent Office, did participate in the preparation of said article, its publication or presentation; that they did so knowing that the preparation and publication of the article was for the purpose of influencing action on the Peiler application; and that they did not intend to, and did not, disclose to the Patent Office their participation in such preparation or publication. He has therefore subjected the petitioners to the disciplinary action of disbarment.

■ Much testimony has been given by the three petitioners and other witnesses on their behalf, including Clarke, to show the lack of knowledge on the part of each petitioner as to the purpose for which the article was prepared, the limited extent of participation in its preparation by the several petitioners, and the absence of any intent to deceive the Patent Office, and also to show that the Patent Office was not deceived by the use of the article. It was for the trier of the facts to determine what weight should be given to such testimony, what facts were established by other evidence properly admitted, and what reasonable inferences were to be drawn from such facts so established. I am of the view that there is ample and substantial evidence properly admitted at the hearing to support the conclusions and action of the Commissioner, as above stated.

■ It is urged by each of the petitioners that Clarke was in truth the author of the article and therefore there was no misrepresentation, concealment or failure to make disclosures that should have been made to the Patent Office. It is true that Clarke did adopt, "with slight alteration," sign and authorize the publication of the article which had been drafted, with some assistance and advice from Carter and slight assistance from Dorsey, by Hatch. Clarke in his testimony states that he always considered it his article and still does. Petitioners, in effect, say that the article is nonetheless Clarke's because it was initially prepared by Hatch, and particularly so where it was understood that Clarke should have the right to revise it to any extent that he wished. That Clarke would be bound by what he signed and authorized to be published, and that he would be regarded as the author of the article in a setting other than a hearing on the Peiler application in the Patent Office is quite beside the point here. The critical point is that it was material in the consideration of such article to know that it had been substantially prepared and published by those interested in securing the allowance of the broad claims of Peiler. The analogy sought to be made with the signing of a letter by any responsible person or official that had been prepared by some one at his direction or acting for him also misses the same point, because there initial draftsmanship is ordinarily immaterial. It is also urged that Hartford's counsel, without any criticism, could have secured from

Clarke a statement in affidavit form of the same matter as contained in his article, even though the three petitioners had actually drafted such affidavit. The two, however, are not the same in the setting here being considered. Every implication concerning an affidavit filed by a party in support of his contentions is that the affiant made his statements at the request and on behalf of the party using his affidavit. Every implication with respect to an article published and signed by a person having no known or revealed connection with a party litigant is exactly to the contrary.

It is insisted that the Clarke article is true and, therefore, that the petitioners are not guilty of any deception in connection therewith. The truth of the statements in the Clarke article was not an issue in these proceedings. It was expressly stated during the course of the hearings that it was not. Even though the article contained no mistakes or false statements, its weight as evidence depends as much upon its origin as its content. To exculpate petitioners from aiding and participating in the preparation of the article to be presented as the article of Clarke without disclosing their connection with its origin, it is not sufficient to say they did not make false statements in the article.

That the Clarke article was used to impress the Patent Office with the commercial success of the Peiler patent is hardly open to serious question. No other use of the article would reasonably account for its preparation, publication and presentation to the Patent Office. It is true that no mention in the article of the Peiler machine and method was made by such name. Nevertheless, it is also true that, with respect to the gob feeders, the commercial success of which was compared in the article to the commercial success of the Owens machine, it was said in the article—

"These new feeders cut off a suspended chunk or gob of glass which was preformed during suspension to correspond, to some extent, at least, to the shape of the mold cavity in which it was to be received."

That this was an implicit assimilation of the gob feeders discussed in the Clarke ar-

ticle and their commercial success to the Peiler patent and the machines and methods developed by him seems obvious when read in connection with the purpose of the Peiler plunger or needle feeder, as stated in the Peiler patent and application therefor—

"To avoid these defects [existing in the prior art] it is desirable to pre-form the mold charge, before it enters the mold, so that its external contour will closely approximate the interior contour of the mold walls, or at least that portion of the mold which receives the gather."

It is true that in the Clarke article it is stated that—

"This new feeder was what is now known as the gob feeder and since that time feeders operating upon this principle have been put out by a number of manufacturers, including the Hartford-Fairmont Company, George E. Howard, Tucker & Reeves, W. J. Miller and others."

It is argued that because the Clarke article mentioned manufacturers other than Hartford, there was no implication that the commercial success pointed out in the article was that of the Peiler machine and method. It is not without significance, however, that the other manufacturers mentioned specifically made machines, the patent rights of which had been acquired by Hartford, and which came within the broad claims made by Peiler. It is urged that the Patent Office could not have been lead to believe that the commercial success shown in the Clarke article related only to the Peiler invention because it was shown in Peiler's affidavit that numerous other gob feeders were in production. It must be remembered, however, that Peiler claimed to be responsible for the invention of the features which made the other machines commercially successful, and indeed stated that several competitors were paying royalties to the assignee of his patent. It does not follow that, because such an argument could be made in good faith, it was legitimate to support such argument by presenting an article in the preparation of which each of the three petitioners had, to some extent at least, participated, without disclosing such par-

ticipation and that its publication had been procured by the assignee of the Peiler application.

■ Hatch and Carter insist that they had no part in the presentation of the article to the Patent Office. Dorsey insists that he had no part in its preparation, and he and Carter insist they had no part in its publication. It is claimed, therefore, that, as no conspiracy is charged, no one of them can be held responsible for any act of the others. The essential wrongdoing is taking part either in the preparation of the article, with knowledge that it was to be used in the Patent Office, without disclosure of the part that had been taken in its preparation by any person interested in the allowance of Peiler's claims, or the making use of the article in the Patent Office, with the knowledge that it was prepared by any person interested in the allowance of Peiler's claims, without disclosure of such participation. Any such participation, with such knowledge, was an inexcusable aid to the accomplishment of a scheme to deceive the Patent Office, and was conduct falling far short of the standard which the Commissioner of Patents had a right to expect of any registered practitioner in the Patent Office. There is ample evidence against each of the petitioners to support a finding of such participation with such knowledge without resort to the rule of evidence that, where a conspiracy is proved, each conspirator is answerable for acts of the others.

■ It is argued at much length by the petitioners that they were found guilty of misconduct other than that charged, and thus denied due process. With this contention, I cannot agree. In my view, the charge in the rules to show cause is sufficient basis for findings which sustain the action of the Commissioner, and it sufficiently apprised the petitioners of the matters they were called upon to answer.

■ It is indeed tragic that the severe penalty of disbarment should be visited upon these petitioners for acts of such distance in the past. It is for this Court, however, only to say in this connection whether or not such delay constitutes a bar to the prosecution of the disbarment proceedings, or has so impaired the rights of petitioners to a fair defense that they cannot now be held accountable for their past conduct. I must answer both questions in the negative. The conduct of the petitioners called into question by the disbarment proceedings was not, nor does it appear that by reasonable diligence it could have been, known to officials of the Patent Office prior to the time that information and evidence as to such conduct became available during the trial of the case of United States against Hartford and other glass companies. After such information became known in that case and until the Hazel-Atlas and Shawkee cases were decided by the Supreme Court, the Commissioner of Patents had reasonable justification for not starting proceedings against these petitioners, whose conduct, although they were not parties to such litigation, was under consideration in said cases. No showing has been made that the delay has prejudiced the petitioners in their defense.

■ It is urged that disbarment of petitioners is too severe even though their conduct should be considered wrongful. That the Commissioner gave consideration to an alternate and milder discipline is quite evident from the fact that a minority of the Committee recommended only suspension. Having determined, after due notice, a fair hearing, and upon substantial evidence, that the petitioners were guilty of gross misconduct, it was in the discretion of the Commissioner to determine the proper disciplinary action in accordance with the applicable statute. I can find no abuse of such discretion here.

After full consideration of all of the contentions made by each of the petitioners, many of which I do not consider necessary to discuss in this memorandum, I am of the opinion that the orders of the Commissioner of Patents here under review should be affirmed. Appropriate orders will be submitted by counsel.