**DORSEY v. KINGSLAND, Commissioner of Patents.**

No. 9572.

United States Court of Appeals
District of Columbia Circuit.

Argued Jan. 22, 1948.

Decided Jan. 26, 1949.

Writ of Certiorari Granted May 31, 1949.
See 69 S.Ct. 1160.

EDGERTON, Circuit Judge, dissenting.

———◆———

Order reversed.

Mr. William E. Leahy, of Washington, D. C., with whom Mr. James F. Reilly, of Washington, D. C., was on the brief, for appellant.

Mr. Jo. Baily Brown, Special Assistant to the Secretary of Commerce, of Pittsburgh, Pa., with whom Mr. E. L. Reynolds, of Washington, D. C., was on the brief, for appellee.

Before EDGERTON, CLARK, and WILBUR K. MILLER, Circuit Judges.

CLARK, Circuit Judge.

This is an appeal from a denial by the District Court of the petition of Vernon M. Dorsey to annul an order of the Patent Office which disbarred appellant from practice before the Patent Office on grounds of gross misconduct. Such facts as are material to the decision in this case are set forth below and are, therefore, not rehearsed at this point.

To the majority of this court the whole record of this case bears indelible evidence that the conduct of the Patent Office in the whole proceeding carried out nearly two decades after the alleged commission of the offense amounts to a classic exemplification of a citizen being deprived of a valuable right (as well as honor and a means of livelihood) without due process of law or indeed without process of law of any kind except bureaucratic "lynch law."

The appellant, Vernon M. Dorsey, now nearly eighty years old has been an honored and respected member of the Bar of the Patent Office since 1890, and of this court since its inception. It is conceded on all hands that his whole record during all of this time, both before and since 1926

(the date of the alleged commission of the offense for which he was convicted) has been exemplary and without a blemish. Both the lapse of time between the alleged commission of the offense and the trial and also the exemplary conduct of the appellant both before and since the alleged offense become extremely important under the doctrine of this court expressed in In re Adriaans,[1] where both considerations were given major weight.

This case is so nearly a "bay-horse" case[2] that it deserves to be specially considered at this stage of the proceedings. The following quotations from the opinion of this court in that case show clearly the nature of that case and make perfectly apparent at a glance its direct application to the instant case. The case has never been overruled or modified.

In that case in speaking for the court, Justice McComas said in part: "The disbarment of Adriaans for *misconduct* which happened about twelve years before is most unusual. The majority of the justices of the supreme court [now the District Court] who concurred in the order of disbarment appear to appreciate this, for they say that under ordinary circumstances the lapse of time would cause the court to seriously consider the long delay in filing the charges. *The record discloses* no extraordinary circumstance which persuaded the court to ignore this long delay. The court do say that, if Adriaans were guilty of the specific offense charged to have been committed twelve years before, *he* has not offered proof of any amendment of his conduct since. *We are more impressed by the absence from the record of charges of misconduct since.* Here this charge stands alone."[3]

Here this court clearly held that the burden was on the proponents of disbarment to show subsequent misconduct and that failing that, in the absence of extraordinary circumstances, the lapse of twelve years would go far to cure the specific offense alleged. The similarity of the two cases is striking except that in the Adriaans case

---

[1] 1907, 28 App.D.C. 515.

[2] An expression commonly in use in some jurisdictions to indicate that the case cited and the case being decided are so identical that not only is the ownership of a horse involved in each but that both horses were *bay* horses.

[3] 28 App.D.C. at page 519.

the lapse was twelve years, in the instant case more than eighteen.

And (28 App.D.C.) at page 522, this court said: "The disbarment of an attorney is a serious punishment. The right to exercise his profession should not be lightly taken from an attorney. When the court determines to disbar an unworthy member of an honorable profession it ought to require the *clearest legal proof.*"

And again (28 App.D.C.) at page 523, the court said: "*After twelve years* we must be careful not to assume what the evidence failed to prove."

The very point which has been the fatal defect in the theory of appellee from the beginning and continued throughout this argument is here pointed out in this old case with unerring finger by this very court.

And the court concluded: "The charge of misconduct upon the specification of misconduct whereon the court passed the order appealed from is not supported by the proof. *We naturally hesitate to review the finding of the court below, but we are convinced that the evidence here is not legally sufficient to justify the disbarment of this respondent.* Though we are disinclined to interfere with the order of the supreme court of this District in a case of this character, we are unable to resist the conclusion that these equity proceedings, after twelve years' delay to make this charge, as a ground for disbarment of this attorney, are not such *clear and definite proof of the misconduct alleged as to justify us in affirming this order.* * * * The power to disbar ought always to be exercised with great caution and only in clear cases. No criminal proceedings on this account were commenced against this respondent, and after this long delay we cannot agree with the court [below] that the matters disclosed by this record suffice to sustain this order. *This is not a criminal proceeding, but such a charge should be supported by a preponderance of satisfactory evidence. The case should be clear and free from doubt.* The career of an unworthy member of the bar is apt to reveal misconduct more recent than in this case, where the proof is legally insufficient to disbar this respondent on account of an offense alleged to have been committed about twelve years ago."[4]

The order of disbarment was therefore reversed outright.

(The italics throughout the quotations from this opinion are supplied).

In this proceeding instituted nearly twenty years after the transaction complained of, the Patent Office makes the pitiful admission of incapacity that a great and responsible agency of the Government could be unduly influenced and controlled in the adjudication of valuable rights confided to its jurisdiction by the mere introduction of an article in a trade journal. It is no reflection on the integrity of trade papers which serve a useful and valuable purpose in our commercial life to say that they are certainly not authoritative scientific treatises or to state the fact known of all men, that insertion of articles in their columns may sometimes be influenced by the wishes of good and lucrative advertisers. It was the duty of the Patent Office under the law to investigate these matters for itself, to arrive at a determination on the facts and evidence presented and not to shift the burden of its own responsibilities to a blind reliance on some article presented from some trade journal, which with ordinary intelligence it might have known to be self-serving for the party offering it.

Contrary to this salutary rule, the Patent Office in a desperate effort to alibi its confessed failure to perform its duty waited more than eighteen years until the evidence had largely disappeared to bring stale charges against appellant, and then proceeded to try and convict him before a "kangaroo court." We use the term "kangaroo court" advisedly because this so-called tribunal tried appellant on charges most of which were not even included in the notice to show cause and on which there is not a shred of evidence to connect him, convicted him on several of these charges and deprived a venerable man and respected lawyer of his means of livelihood. For a lawyer to be disbarred is the equivalent of a soldier receiving a dishonorable discharge on the field of battle. He is deprived of not only a valuable right but of honor as

---

[4] 28 App.D.C. at pages 524, 525.

well and an irremovable aspersion is cast upon his character as long as the judgment stands.

The only justification assigned for disbarring appellant on a proceeding which included trial on many charges of which he had not been apprised and had not been afforded an opportunity to prepare his defense and as to which the evidence did not even remotely connect him, was that as a witness in his own behalf he did not assume the burden of proof and affirmatively disprove the allegations against him (of many of which he had not been notified) and that on some questions his memory was faulty in that he sometimes responded that he could not remember. Mirabile dictu!

We have known many lawyers in our time. We cannot recall any who have been in active practice, many of whom are many years younger than appellant, who would be prepared when called upon, under the pain of being arbitrarily deprived of his livelihood and his honor, to testify as to all the incidents of a case which had been tried eighteen to twenty years before or as to the considerations which had led him to tender evidence or to fail to tender evidence. To say that a man approaching eighty should be disbarred because he could not remember some incident of a trial which took place twenty years before seems to us to be absurd.

██ The majority of this court are of the opinion that the learned trial court takes altogether too narrow a view of its own jurisdiction. It proceeds upon the theory that the case is one for the strict and extreme application of the doctrine of "administrative finality,"[5] which might better be known as "administrative infallibility." But whatever may be one's opinion of this doctrine, it has no possible application to this case. The action of the Commissioner here complained of in disbarring Dorsey was not an administrative act. It

was a quasi-judicial act. The whole theory of administrative finality stems from the assumption that the administrative agency is composed of "experts"—in many instances a most erroneous assumption. But conceding that the personnel of the Patent Office may be experts in their administrative function of determining patent and copy-right claims, the horrendous hash made of the record in this case shows clearly that they are by no means experts in a quasi-judicial proceeding wherein they went to the utmost extreme in their zeal to deprive a citizen of a valuable and precious right without due process of law.

Under Section 8 of the Patent Act of 1861, it was provided that the Commissioner of Patents for gross misconduct, "may refuse to recognize any person as a patent agent, either generally or in any particular case; *but the reasons of the Commissioner for such refusal shall be duly recorded, and subject to the approval of the President of the United States.*"[6] (Italics supplied.)

This amounted to a declaration by the Congress that matters of disbarment and disqualification arising in the Patent Office should be handled and disposed of subject to the approval of the President in the administrative process.

By the Act of 1870, reenacted in 1884, it was no longer necessary to obtain the approval of the President but the approval of the Secretary of the Interior (in whose Department the Patent Office was then located) for that of the Chief Executive. Here again the Congress showed its intention of having these matters disposed of under the administrative process.

Even under this state of the law, this court held in Garfield v. Spalding,[7] that the court had power to set aside a disbarment order when there is denial of due process of law.

---

[5] For further clarifying discussion of the doctrine of administrative finality, see the opinion of Judge (now Chief Judge) Stephens of this court in Philadelphia Co. v. Securities & Exchange Commission, 1947, 82 U.S.App.D.C. 335, 164 F.2d 889, certiorari denied, 1948, 333 U.S. 828, 68 S.Ct. 452, wherein (164 F.2d at pages 897–898) a careful analysis is made of those portions of the opinion of the Supreme Court in Rochester Telephone Corporation v. United States, 1939, 307 U.S. 125, 59 S.Ct. 754, 83 L.Ed. 1147, which deal with that doctrine.

[6] 12 Stat. 247 (1861).

[7] 1908, 32 App.D.C. 153.

The rule, however, was stated in Wedderburn v. Bliss.[8] In that case Wedderburn was found guilty by the Commissioner and the decision was affirmed by the Secretary without the latter having taken the trouble to hear argument on behalf of Wedderburn. Wedderburn applied for mandamus to compel the Secretary to grant him a hearing before affirming the order of the Commissioner. The District Court denied mandamus and this court affirmed this action saying, 12 App.D.C. at page 492: "The question in the case is, whether the appellant had in the Department of the Interior the *hearing upon his case to which he was by law entitled.* For, as to the character of the judgment to be rendered upon such hearing, there is, of course, no pretence that it can be controlled or directed in any manner by the courts of law, *or that it is subject to review by any other tribunal for any supposed error.*

"The final determination upon such hearing is for the Secretary of the Interior, and not a matter for the consideration of the courts." (Emphasis supplied) But by 1922, a change had come o'er the spirit of the congressional dream. Recognizing correctly that the deprivation of a valuable right of a citizen was one which involved due process of law and therefore was a matter *for judicial rather than administrative examination,* the Congress in passing a bill sponsored by the Bar Association deliberately took the whole matter out of the administrative process and subjected it to the judicial process. It dispensed with the approval and review of the Secretary of the Interior (now replaced by the Secretary of Commerce) and instead imposed the right and duty upon the District Court at the instance of an aggrieved party to conduct a "review" of the case. *Here* was that mandate for a judicial review for the lack of which this court had decided against Wedderburn as we have noted *supra.* And *where* under the language of this statute does the doctrine of "administrative finality" have any place in the case?

That statute which gives jurisdiction to the District Court follows: "The Commissioner of Patents may, after notice and opportunity for a hearing, suspend or exclude, either generally or in any particular case, from further practice before his office any person, agent, or attorney shown to be incompetent or disreputable, or guilty of gross misconduct, or who refuses to comply with the said rules and regulations, or who shall, with intent to defraud in any manner, deceive, mislead, or threaten any applicant or prospective applicant, or other person having immediate or prospective business before the office, by word, circular, letter, or by advertising. The reasons for any such suspension or exclusion shall be duly recorded. *The action of the commissioner may be reviewed upon the petition of the person so refused recognition or so suspended or excluded by the district court of the United States for the District of Columbia under such conditions and upon such proceedings as the said court may by its rules determine.*"[9] (Emphasis ours.)

It seems to us that the review contemplated was a full judicial review just exactly like that of any other case where judicial review is provided. By that act, Congress changed the whole matter of disbarment from an administrative proceeding to a quasi-judicial one, which in truth it was. The District Court had full and original jurisdiction for a complete review just as this court has and has always exercised in the matter of appeals from disbarment from the District Court. It is believed that there has not been a single case in this court where this court has failed to re-examine the entire record in a disbarment proceeding and to examine the case de novo to insure the fullest opportunity to the accused lawyer to protect his honor and preserve his means of livelihood. A typical and most persuasive case is the Adriaans case, quoted supra. It seems to us that the District Court should be permitted to do no less to insure due process of law in reviewing cases of disbarment from the Patent Office than this court does in reviewing proceedings of disbarment from the District Court.

An illuminating note on the degree of quantum of proof necessary to justify disbarment or suspension of an attorney is to

---

[8] 1898, 12 App.D.C. 485.

[9] 35 U.S.C.A. § 11 (1936), based upon 42 Stat. 390, 391 (1922).

be found in 105 A.L.R. 984 following the case of In re Mayberry, 295 Mass. 155, 3 N.E.2d 248. From the cases cited in this note it appears that while a few jurisdictions require only a preponderance of the evidence, or a "fair preponderance", a larger number require a "clear preponderance", and a still larger number of respectable authorities require "clear and satisfactory proof," "clear and convincing proof" or "proof clear and free from doubt." A few cases have held that where crime or grave malpractice is alleged the proof must be "beyond a reasonable doubt."

■ To be sure, at the time of the enactment of.Section 11 in 1922, the doctrine of "administrative finality" (or administrative infallibility) had never been heard of. But by 1946 this theory was thoroughly familiar to lawyers and Congress proceeded to legislate upon it, among other things, by passing the Administrative Procedure Act of 1946, 5 U.S.C.A. § 1001 et seq. (1946). Under Section 10(e) of the Administrative Procedure Act, it became the right and indeed the duty of the court upon proper application of an aggrieved party to judicially review the action of any agency, and it may review the whole record of the proceedings had below for the. purpose of ascertaining any prejudicial error. Under these provisions the burden of proof must be upon the proponent of the rule to show cause.

The whole legislative history of the Administrative Procedure Act and more particularly the luminous discussion on the floor of the Senate between three of the leading lawyers of the Senate, Senators George, McCarran and Ferguson conclusively .show that it was the inflexible intention of Congress to (in the language of Chairman McCarran of the Senate Judiciary Committee): "establish a guide for administrative groups so that they would apply the rule in such a way that there would be *substantial probative evidence* behind their findings, and so that they could say, 'We are not·afraid to have our findings reviewed by a court' * * * We are saying that there must be probative evidence of a substantive nature, and that even though the commission or bureau may take

hearsay evidence in its hearings, *it must have some probative evidence to sustain its finding.*" (Italics supplied.)

In this discussion it was repeatedly agreed between Senators· McCarran, George and Ferguson, all eminent former jurists, that the Act was intended to change and did change the, construction put upon various acts of Congress by some courts that *any* evidence would ,be sufficient to sustain the verdict or judgment of an administrative agency and to substitute therefor the doctrine that .*substantial probative* evidence must be required.

■ In view of ·these statutes and their history, it .seems to us that the trial court by the extremely narrow view of its own jurisdiction, limiting it in effect to the "administrative finality" and "abuse of discretion" doctrines, has denied the appellant the protection of the statutes mentioned and in effect permitted him to be deprived of a valuable right without due process.

It is our opinion that appellant was disbarred· by the then Commissioner without *substantial probative* evidence on any of the five points in which he was found guilty and without any evidence at all on some of them. Some of the allegations on which the Committee found Dorsey guilty were so puerile they should have been summarily stricken by the Commissioner and, failing that, by the trial court.

The so-called Board (spoken of in appellee's brief as sacrosanct) especially disclaimed any controlling influence from the decision of the Supreme Court in Hazel Atlas Glass Co. v. Hartford Empire Co., 322 U.S. 238, 64 S.Ct. 997, 88 L.Ed. 1250, or by the decisions of the Third Circuit Court of Appeals. This disclaimer was obviously necessary because Dorsey was not a party to any of these suits, had no opportunity to appear and defend himself and is in no sense bound by them. Even the able Special Counsel could not escape this necessity as witness his strident disclaimer (App.Br. 33). Even he had to admit that there was nothing in these opinions to establish individual guilt on the part of Dorsey.

Without, at this stage of the proceedings, attempting to go into all the details of the record in this case, we will briefly recapitulate the salient points.

In 1926 there was pending in the Patent Office an application for a patent by a man named Peiler, whose assignee was the Hartford Empire Company of Hartford, Connecticut. More than eighteen years after, to wit, in late 1944, a notice to show cause why he should not be disbarred from practice before the Patent Office was served upon appellant Dorsey who was a resident practitioner before the Patent Office, of which bar he had been an honored member for fifty-four years. At approximately the same time identical notices to show cause were served on three other respondents. They were: (1) Robson D. Brown of Hartford, Conn., who had charge of the Patent Department of the Hartford-Empire Co., assignee of the Peiler patent application, (2) Roswell F. Hatch of Hartford, Conn., who was employed by Hartford as a contact man between his employers' engineers and the Patent Office, (3) Henry W. Carter of Toledo, Ohio, an officer of the Owens Bottle Company, which was a licensee of the Hartford-Empire Co., and therefore a party in interest on the Peiler application under which they were a licensee from the assignee.

It is to be particularly observed that while the language of the notices to show cause was identical, they were not *jointly noticed* nor was any allegation of conspiracy set out in any of the notices. When the cases were heard before the so-called committee appointed by the appellee (or his predecessor twice removed) the four cases, as the appellee contends, were consolidated. Just how that was accomplished is left in considerable doubt. Under the circumstances it could only be done by consent and stipulation. We have been unable to find any such consent or stipulation in the record. Both parties have brushed it lightly aside in their briefs. Appellant in his brief (page 3) says: "The hearings as to all of the respondents were consolidated, *it being understood* at the hearing that the committee had four separate cases before it but only one record." (Emphasis supplied.) Appellee in his brief is even more

vague. He says (pages 1 and 2 of appellee's brief): "In the proceeding below the appellant and Roswell F. Hatch, Henry W. Carter, and Robson D. Brown were individually served with identical rules to show cause why they should not be disbarred for gross misconduct. They filed separate answers to those rules. They appeared before the Committee on Enrollment and Disbarment of the Patent Office together, [they necessarily appeared together since they had been separately noticed to appear at the same time] and by agreement of all concerned a joint record was made." The result was simply a record of mob procedure.

Appellee has cautiously refrained from any reference to the record to bear out this sweeping statement, and a painstaking examination of the record has failed to reveal to this court either the specific terms of any such stipulation or the purport thereof although it is vitally necessary to the jurisdiction of the committee and the Commissioner.

Certainly it seems inconceivable to the majority of this court that a lawyer of the admitted experience and ability of appellant would deliberately and voluntarily have verbally agreed to waive his rights and consent to be tried without notice on charges on which he had *not* been put on notice, of some of which he had never even heard, and convicted and deprived of his rights on charges of participating in events of which he had never even heard until the introduction of evidence before this alleged tribunal involving some of the other respondents to this shot-gun joindure but without the remotest scintilla of evidence of knowledge or participation against appellant himself. On such procedure as this, according to the special counsel for appellee, the appellant is to be deprived of his hard won and long and respectably held position at the Bar. As a matter of fact, special counsel has repeatedly relied upon his own inferences based on the virulence and malevolence which has been manifest in the pursuit of Dorsey throughout these proceedings to piece out irremediable gaps in the chain of necessary "substantial probative" evidence. Special counsel is an able and experienced lawyer and should

know full well that his own imaginings cannot supply the lack of this vitally necessary substantial probative evidence and that vituperation cannot take the place of facts.

The committee apparently found Dorsey guilty on five counts although both the charges and the findings are so confused that it is difficult to determine just what any of the defendants were charged with or convicted of. The charge as to Dorsey's participation in the preparation of an article for filing in the Patent Office is the first. The record shows, and Justice Morris found, that Dorsey's connection with the preparation of the article consisted in a slight verbal correction of a draft which had been sent him. Justice Morris found that these corrections probably amounted to a change of only two words. And this was the whole amount of Dorsey's participation in the preparation of the article.

The record shows that sometime late in 1925 there was some discussion between Dorsey and Brown as to the desirability of an *affidavit* or article which could be inserted in the file in the Peiler application supporting patentability. It was agreed that a suitable person to prepare the article would be Mr. Henry W. Carter, an officer of the Owens Glass Company, a licensee under the patents controlled by Hartford. The desired evidence was supplied by Peiler himself who wrote an exhaustive article involving the history and development of the glass makers' art. This was reduced to affidavit form and filed as an exhibit in the case. This affidavit embodied everything that Dorsey had hoped to prove.

In January, 1926, Dorsey went to Europe and did not return until sometime in April of that year. Upon his return he found a draft of an article which had been prepared by Hatch and which Hatch stated it was his intention to submit to one Maloney, who Hatch stated was president of the Bottle Blowers, with the request that Maloney look it over, correct or rewrite it in any way he saw fit and sign it. Maloney, as it later appeared, declined to sign this, not because he disagreed with any of the contents, but because he did not wish to offend any of Hartford's competitors. Dorsey made some slight minor correction (found by Justice Morris, the trial judge, probably not to exceed two words) and returned it to Hatch. It later transpired in the somewhat confused and bemired record, that it had been Hatch's original intention to have Carter sponsor the article. This it later appeared Carter had been unwilling to do because his connection with and knowledge of the glass making art and the changes in it were too recent to justify his writing or sponsoring a historical article on the subject. Hatch then turned to Maloney who declined on the grounds above stated.

Up to this time there is no suggestion and no evidence that Dorsey had the slightest knowledge of the Hatch manuscript prior to his examining it and returning it to Hatch and it does not appear that he had any knowledge that Dorsey knew that Hatch intended it for use in the Patent Office. Dorsey testified that the article submitted by Hatch did not interest him because it was not of the same nature as that which Dorsey and Hatch had discussed. (This need had been supplied by the Peiler affidavit.) Dorsey contended that he had no knowledge that Hatch intended the article to be used in the Patent Office and that at the time he made the minor correction of two words he had no intention of filing it in the Patent Office.

Dorsey later remembered the manuscript and wrote Hatch for a copy of it. Hatch replied by sending a copy and in a letter accompanying it stated that he had submitted the article to Clarke, president of the American Flint Glass Workers' Union, and that Clarke stated he would consider revising it and publishing it over his own signature. Hatch stated to Dorsey that he had had to defend the truth of his article. As a result Hatch wrote that Clarke had agreed to "rewrite the article to a considerable extent, I suspect, and publish it in the trade journal."

The article was subsequently filed in the Patent Office by Dorsey who signed a letter prepared by Brown, the head of the Patent Department of Hartford. This letter did not inform the Patent Office that

the article had been prepared at the instance of Hartford. The Patent Office found Dorsey guilty because he had presented the Clarke article to the Patent Office by falsely representing Clarke to be the author. But the District Court drew a differentiation as follows:

"The critical point is that it was material in the consideration of such article to know that it has been substantially prepared and published by those interested in securing the allowance of the broad claims of Peiler."

No such critical point is to be found in the specification of the rule to show cause, nor can it be construed as broad enough to cover it. Manifestly a party cannot be found guilty and subjected to a severe penalty upon charges of the nature of which he is not even apprised.

In the case of Czarra v. Board of Medical Supervisors,[10] this court said: "It is not conceivable that any man can be held to answer a charge so grave in its character and so far-reaching in its influence upon his standing and reputation as a physician, and yet so vague and indefinite as this."[11]

This court quoted with approval the statement of the court in People use of State Board of Health v. McCoy, 125 Ill. 289, 17 N.E. 786, to the effect that: "The right of the citizen to practice his profession for which he has expended time and money to qualify himself is too important to be taken away from him without some reasonable cause."[12]

And in the same case this court also cited with approval the case of State ex rel Baldwin v. Kellogg, 14 Mont. 426, 36 P. 957, wherein it is said: "But it cannot for one moment be doubted that the complaint must set forth facts which constitute an offense. * * * If the judgment is against him, he is deprived of the right to practice his profession, to which perhaps he has devoted a life of learning and labor. In a situation of this gravity, a defendant has the right, within the spirit of the constitution, 'to demand the nature and cause' of the accusation' * * *; that is to say, a defendant must be notified of what he is charged, and he must be charged with something."[13]

Moreover, we do not believe that Dorsey was guilty of any dereliction of his duty as a member of the Patent Bar by his failure to make known the exact contribution of several people to the preparation of the article, even if he had known it. The test should have been the truth or falsity of the facts set out in the article and we do not understand that the truth of these statements has been called into question in any quarter.

An attorney who had occasion to quote from Washington's Farewell Address would be guilty of no breach of faith if he failed to mention the fact that it is generally believed that a considerable part of the actual penmanship was done by Alexander Hamilton. One who quotes from Andrew Jackson's majestic Nullification Proclamation is not to be criticized for fraud if he fails to set out the fact that while written from Jackson's notes the stately diction is actually the result of the penmanship of Edward Livingston. It is generally known that most Presidents and candidates for President employ assistants who not only engage themselves in preparing data and making suggestions for the speeches and state papers of their chiefs but frequently participate extensively in the actual draftsmanship. Yet seldom, if ever, in the delivery of the speech is attention called to the portions actually written by the deliverer and the portions supplied by the assistants. It is not wholly unknown that the judges of even the highest courts have law clerks and that these law clerks are engaged not only in research but frequently make most valuable suggestions as to the preparation of opinions and not infrequently participate largely in the actual draftsmanship of the opinion. Yet when these opinions are handed down no specific mention is called to the paragraphs actually written by the judge rendering the opinion and those written by the law clerk or those inserted as a result of the suggestions of other judges who may or may not have sat in the case.

---

[10] 1904, 24 App.D.C. 251.
[11] 24 App.D.C. at page 257.
[12] 17 N.E. at page 787.
[13] 36 P. at pages 958, 959.

■ The next two charges on which appellant was convicted are identical except as to the tribunal. One is that Dorsey misled or attempted to mislead the Patent Office as to the inferences and conclusions to be drawn from the Clarke article. The next is identical except that in that it is charged that Dorsey misled or attempted to mislead the Third Circuit Court of Appeals as to the import of the Clarke article.

· The latter was too much for the stomach of appellee's special counsel and he tacitly abandons it in his brief (appellee's brief p. 32). Yet appellant was tried and convicted upon this charge and so far as anything in the record shows this count may have been the moving consideration in administering the extreme penalty of disbarment. So far as we have been able to learn this count is a case of first instance in the judicial annals of this country. So far as we have been able to find never before in the history of the country has a subordinate committee of a mere bureau of the government had the arrogance to assume to set itself up as the protector of the dignity and intelligence of a United States Court of Appeals.

It seems not untimely to remark that if counsel were to be disbarred if they made an inference or drew a conclusion as to the import of any evidence which happened to be at variance with the view of the same evidence held by opposing counsel or by the court, the bar of every tribunal in the country from the Supreme Court down to the Patent Office would soon be decimated.

The trial court did not find that Dorsey was guilty of misrepresenting the contents of the Clarke article and in our opinion erred when it did not reverse the Commissioner for finding Dorsey guilty on this count.

■ We come now to the last charge, the charge involving the payment of $8,000 to Clarke by Hartford some six years after the publication of the article. The committee and the Commissioner seem to have put great emphasis upon this transaction in arriving at the punishment of disbarment. But neither the committee nor the Commissioner nor any one else can find in the record one scintilla of evidence connecting Dorsey in any way directly or indirectly with the payment to Clarke or with having the slightest knowledge or intimation of it until it was brought out in open court in Toledo in 1941. While the committee's findings lay great stress upon this point in arriving at the maximum penalty, appellee in his brief attempts to limp away from it. He says (p. 321): "There is no evidence in the record that Dorsey participated in the arrangement for those payments or even knew of them at the time they were made. Consequently, we have never made any point against Dorsey because of the payments per se." Then appellee somewhat lamely tries to sidle out of this admission by the somewhat boastful assertion that if it had been necessary he could have tied Dorsey into this transaction "*through the conspiracy rule.*" Appellee's eminent special counsel apparently overlooked the admitted fact that no conspiracy was alleged and that appellant and no one else was tried on that charge. The amount of attention paid to this finding by the committee and the Commissioner, with which Dorsey was not even remotely connected, indicate that the whole finding should be reversed outright.

■ Appellee strongly contends that the statutory remedy of appeal from a proceeding of disbarment ends with the District Court. In other words, he conceives of the subjection under the statute to judicial process as a very short, one-way street which comes up against a dead wall with the decision of the District Court. We see no merit whatever in this view.

Under the Securities Exchange Act of 1934, 15 U.S.C.A. § 78a et seq., apparently exclusive jurisdiction is vested in the appropriate Court of Appeals to review the findings of the Commission. Nothing is said explicitly in the statute as to further appeal to the Supreme Court. Yet the Supreme Court frequently does entertain petitions for certiorari and sometimes reverses the action of the Courts of Appeal.

The same situation exists with the Federal Trade Commission Act, 15 U.S.C.A. § 41 et seq., the Perishable Agricultural

Commodities Act, 7 U.S.C.A. § 551 et seq., the Agricultural Adjustment Act, 7 U.S. C.A. § 601 et seq., and other statutes too numerous to mention. In all of these instances appeals are regularly taken to the Supreme Court, despite the fact that no specific language in the statute authorizes appeals beyond this court. The reason is, of course, that once a transaction be it administrative or judicial is committed to the judicial process as distinguished from the administrative, appeals follow as a matter of course through regular judicial channels.

We believe also that as a matter of law the judgment of disbarment is excessive. We shall not labor or argue this point in view of the fact that we hold the view that the proceedings in this case are so clearly and unescapably wrong that the judgment appealed from should be reversed outright as was done in the Adriaans case.

Reversed.

EDGERTON, Circuit Judge (dissenting).

I agree with the opinion of Judge Morris in the District Court. Hatch v. Ooms, (Dorsey v. Ooms), D.C., 69 F.Supp. 788.

The term disbarment, though convenient, is not exact. The orders of the Patent Office and the District Court do not forbid appellant to hold himself out as a lawyer, advise clients, and appear in courts. They exclude him from practice before the Patent Office.

It is immaterial that appellant did not write the so-called Clarke article and that the article did not contain false statements. It contained statements of opinion. Appellant represented it to the Patent Office as the disinterested work of Clarke. This representation was false and appellant knew it was false.

This false representation was highly material. As appellant himself says, "It was Clarke's name that gave [the article] its status." As the Supreme Court has said, the article "should have stood or fallen under the only title it could honestly have been given—that of a brief in behalf of Hartford, prepared by Hartford's agents, attorneys, and collaborators." Hazel-Atlas Glass Co. v. Hartford-Empire Co., 322 U.S. 238, 247, 64 S.Ct. 997, 88 L.Ed. 1250.

The record of the present proceedings in the Patent Office contains the following affidavit, which the appellant executed in 1941: "Sometime in the spring or early summer of 1926, Mr. Roswell F. Hatch of the Hartford-Empire Company furnished me with a copy of a manuscript for an article entitled 'Introduction of Automatic Glass Working Machinery; How Received by Organized Labor', which was later published in the National Glass Budget for July 17, 1926, under the signature of William P. Clarke. I read the said manuscript and made some slight suggestions as to its verbiage. * * * At my request, a copy of the National Glass Budget containing the said article, authenticated by an affidavit of the publisher, was obtained and filed in the record of the above-identified Peiler application."

On May 20, 1926, Hatch wrote to the appellant: "I fear I may have to go out to Toledo again to get Clarke to show some speed in this matter and perhaps to supervise what he publishes. I think he understood just what we want published, but he might unintentionally destroy some of the propaganda which we planned. I will see that you get a copy of some Journal in which this article appears when it comes out. * * *"

In the present proceedings in the Patent Office appellant admitted he had represented the article to the Office as the disinterested work of Clarke.

I think the proceedings were properly conducted. I think appellant's fraud was fairly charged, proved, and found. I think the proof conclusive and the result just. The public and social interests in discouraging the fraudulent procurement of patents seem to me to outweigh appellant's interest in his reputation and practice. However, that question is not before us. Where no error of law is involved, we have no authority to substitute our opinions for those of the Patent Office and the District Court. If the evidence of fraud, which I think conclusive, was so much as substantial, we must uphold their action, unless we are prepared to rule as a matter

of law either that fraud in procuring **a** patent is too trivial to be "gross misconduct" or that success in concealing fraud for many years creates a prescriptive right to exemption from its consequences.