KINGSLAND, COMMISSIONER OF PATENTS, *v.*
DORSEY.

No. 53.   Argued October 18–19, 1949.—Decided November 21, 1949.

*Robert L. Stern* argued the cause for petitioner.   With
him on the brief were *Solicitor General Perlman, Assist-
ant Attorney General Morison, Paul A. Sweeney, Melvin
Richter* and *Roy C. Hackley.*

*William E. Leahy* argued the cause for respondent.
With him on the brief were *William J. Hughes, Jr.* and
*James F. Reilly.*

PER CURIAM.

Acting under the provisions of § 487 of the Revised
Statutes (35 U. S. C. § 11), the Commissioner of Patents
found after hearings that petitioner, an attorney, had
been guilty of gross misconduct, and entered an order

barring him from practice before the United States Patent Office. Pursuant to authority granted by the same provisions, the District Court reviewed the Commissioner's order. Concluding that the hearings had been fairly conducted after due notice of charges and that there was substantial evidence to support the findings and action of the Commissioner, the District Court affirmed the order. 69 F. Supp. 788. The Court of Appeals reversed, 84 U. S. App. D. C. 264, 173 F. 2d 405. A majority of that court thought the notice of charges inadequate and the proceedings before the Commission unfair. It also held that the District Court had too narrowly restricted its scope of review in holding that substantial evidence was sufficient to support the findings. It apparently drew a distinction between the phrases "substantial evidence" and "substantial probative evidence." Measuring the findings by the latter phrase, it held that the Commissioner's findings were not supported by "substantial probative evidence." Judge Edgerton, dissenting, thought the hearings had been fairly conducted and "the result just." He agreed with the District Court that "substantial evidence" would have been sufficient but went on to say that he thought the "proof conclusive."

The statute under which the Commissioner acted represents congressional policy in an important field. It relates to the character and conduct of "persons, agents, or attorneys" who participate in proceedings to obtain patents. We agree with the following statement made by the Patent Office Committee on Enrollment and Disbarment that considered this case: "By reason of the nature of an application for patent, the relationship of attorneys to the Patent Office requires the highest degree of candor and good faith. In its relation to applicants, the Office . . . must rely upon their integrity and deal with them in a spirit of trust and confidence . . . ." It was the Commissioner, not the courts, that Congress

made primarily responsible for protecting the public from the evil consequences that might result if practitioners should betray their high trust. Having serious doubts as to whether the Court of Appeals acted properly here in nullifying the Commissioner's order, we granted certiorari.

After an examination of the record we are satisfied that the findings were amply supported whether the measure be "substantial evidence" or "substantial probative evidence." The charge of unfairness in the hearings is, we think, wholly without support.

Since the narration of evidence and discussion of the proceedings sufficiently appear in the District Court's opinion, reiteration here can serve no good purpose either for the parties or for the law.

The judgment of the Court of Appeals is reversed and that of the District Court affirmed.

*It is so ordered.*

MR. JUSTICE DOUGLAS took no part in the consideration or decision of this case.

MR. JUSTICE JACKSON, whom MR. JUSTICE FRANKFURTER joins, dissenting.

I agree that the privilege of practicing before the Patent Office is one that may and should be withdrawn for professional misconduct. In defense of his privilege it also is true that the lawyer may not demand that conclusiveness of proof or invoke all of the protections assured to an accused by the criminal process. But while society may expect that his judges will show him no favor because he has lived respectably for eighty years and devoted fifty-nine of them to practice of his profession without blemish, an accused lawyer may expect that he will not be condemned out of a capricious self-righteousness or denied the essentials of a fair hearing.

The court below thought Dorsey had not been fairly judged and indignantly reversed his disbarment. *Dorsey v. Kingsland,* 84 U. S. App. D. C. 264, 173 F. 2d 405. All questions of fact seem to have been resolved against Dorsey by his departmental triers, and I shall not here review all of those issues, even if on some of them Dorsey would seem entitled to prevail. Accepting the findings against him at their full face value, I think the disbarment order was properly set aside.

Back in 1926 the Hartford-Empire Co. conceived and executed a scheme to prepare and publish, over the signature of an apparently disinterested labor leader, an article to be published and then used in support of the company's pending patent application. Such a dissertation, entitled, "Introduction of Automatic Glass Working Machinery; How Received by Organized Labor," was prepared. It purported to be authored by one Clarke, president of a glassworkers' union. It was published in a trade journal and then presented to the Patent Office as recognition by a "reluctant witness" of the success of the device under consideration. Several years later, involved in litigation testing the validity of its patent, Hartford-Empire took steps to suppress evidence of the real authorship of the Clarke essay. It made a gift of $8,000 to Clarke, who had told investigators employed by Hartford-Empire's adversary that he had written the article and would so testify if called upon as a witness. Ultimately, this Court reviewed the actions of Hartford-Empire and held that the sum total of acts attributable to it constituted a fraud on the Patent Office and the federal courts. *Hazel-Atlas Glass Co.* v. *Hartford-Empire Co.,* 322 U. S. 238, reversing 137 F. 2d 764. See also *United States* v. *Hartford-Empire Co.,* 46 F. Supp. 541.

Dorsey was one of counsel for Hartford-Empire in the 1926 patent application and, shortly following our decision in *Hazel-Atlas, supra,* proceedings to suspend or ex-

clude him from further practice before the Patent Office were commenced under 35 U. S. C. § 11. Identical but separate proceedings were instituted against three other members of the patent bar involved in the transactions. All were disbarred. Only the *Dorsey* case is here.

Dorsey was charged with gross misconduct in that, as particularized in the notice which instituted the proceeding, he ". . . participated in the preparation of [the Clarke] article and/or the presentation thereof to the United States Patent Office during the prosecution of said patent application knowing that said article was not written by said William P. Clarke, and with the purpose of deceiving the Patent Office as to the authorship of said article and influencing the action of the Patent Office on said application . . . ."

A view of the facts least favorable to Dorsey indicates that he inspected and criticized a few details of an early draft of the Clarke article and that later, with knowledge that it had been prepared by a Hartford-Empire employee, he submitted it to the Patent Office as being what on its face it purported to be. This is the long and the short of the case against Dorsey. The case against Hartford-Empire, however, included much in which Dorsey is not shown to have had even a consenting part. In two respects only are his actions urged to be wrongdoing: first, in that he deceived the Patent Office as to the real author, and, second (not charged in the notice but advanced here), that Dorsey represented it as the work of a "reluctant witness."

While it is not decisive of the narrow issue of deception pressed against Dorsey, it should be noted as showing how narrow that issue really is, that it includes no claim that any statement in the Clarke article is false or misleading in any respect whatsoever. It stated facts truthfully, facts which a patent lawyer was entitled to bring to the attention of the Patent Office in any manner per-

mitted by its practice. One might expect that the Patent Office would have required facts on which it issued a patent to be proved by affidavits whose truthfulness is encouraged, if not assured, by sanctions against perjury; but it was content to accept unsworn publications for its purposes. The worst that can be said of Dorsey is that he took advantage of this loose practice to use a trade journal article as evidence, without disclosing that it was ghost-written for the ostensible author.

Let us suppose the Patent Office had exacted more lawyerly standards of proof and had required such information to be laid before it in affidavit form. Clarke, let us say, was prevailed upon to make a deposition. Would it be deceit if the lawyer drafted every word of the affidavit, though it purported to be Clarke's testimony? I suppose that the practice is almost universal that the lawyer ascertains to what facts the witness can testify and puts them in presentable form and suitable words, and that the witness adopts the document as his testimony, with any correction necessary to convey his story. Nothing on the face of the usual affidavit discloses the fact that the composition is that of the attorney; on the contrary, it generally recites that it is the witness who "deposes and says . . . ." Is a different standard to be applied to a trade journal article intended and accepted to serve the same end?

I should suppose that, so far as the law is concerned, one may as effectively father statements by adoption as by conception and that sincerely subscribing to what another has written for him does not constitute legal deceit or grounds for disbarment, impeachment or other penalty. And in this case, not only is there no claim that the Clarke article contained one false statement, but there is no denial that, whoever was the scribe, Clarke believed and knowingly adopted as his own every word of it.

I should not like to be second to anyone on this Court in condemning the custom of putting up decoy authors to impress the guileless, a custom which as the court below cruelly pointed out flourishes even in official circles in Washington. Nor do I contend that Dorsey's special adaptation of the prevailing custom comports with the highest candor. Ghost-writing has debased the intellectual currency in circulation here and is a type of counterfeiting which invites no defense. Perhaps this Court renders a public service in treating phantom authors and ghost-writers as legal frauds and disguised authorship as a deception. But has any man before Dorsey ever been disciplined or even reprimanded for it? And will any be hereafter?

It is added, though as something of an afterthought, that Dorsey in his brief to the Patent Office characterized Clarke as a "reluctant witness." I had supposed that such adjectives were in the nature of argument or, at most, of conclusion rather than representation or warranty. The arsenal of every advocate holds two bundles of adjectives for witnesses—such ones as "reluctant," "unbiased," "disinterested," and "honest" are reserved for his own; others, such as "partisan," "eager," "interested," "hostile," and even "perjured," for those of his adversary. I have the greatest difficulty believing that a mischoice among these adjectives has deceived anyone fit to decide facts, or that in any case other than this it would subject the advocate to disbarment. But if wrong in this standard, I should think the use of "reluctant" as applied to Clarke was justified. I should not expect a union president to be other than reluctant to point out the advantages of automatic machinery which tends to throw his membership out of employment. At least I hope we have not come to the time when to urge this inference is even a makeweight in disbarment proceedings.

If, however, a lawyer is to be called upon to be the first example of condemnation for an offense so tenuous, vague and novel, the least courts should require is that the case against him be clearly proved. I shall give but two of several reasons why I think that standard was not met in this case.

First, the Patent Office committee, convened to hear the charges against Dorsey, approached its duty upon the premise that this Court's *Hazel-Atlas* decision established not only Hartford-Empire's guilt but also Dorsey's, unless he should clear his name. The records from that case and from *United States* v. *Hartford-Empire Co.,* *supra,* not only were introduced against Dorsey, who was neither a party nor of counsel in either, but were the sole evidence to support the direct case against him. The committee's recommendation was apparently based upon its conclusion that he failed in the imposed task of proving his innocence. I think this was error of a serious kind.

It should be remembered that our conclusion in that case was reached upon the total effect of many events participated in by many persons whose acts were attributable to Hartford-Empire as their principal. A considerable part was not attributable to Dorsey. The most important and prejudicial of these circumstances which incriminate Hartford-Empire, but not Dorsey, is involved in another error, which I think deprived the accused of a fair trial.

I think that Dorsey suffered prejudice again from receipt of evidence concerning Hartford-Empire's later payment to Clarke and the reliance upon that fact to find Dorsey guilty. This payment was not made as an inducement to sign the article and was made long after Dorsey's relationship to the case had ceased. The Government frankly concedes that there is no evidence it

was made with the approval or even knowledge of Dorsey. The District Court found, and the Court of Appeals affirmed its finding, that "There is nothing in the evidence that connects Dorsey with the payment of any money to Clarke." We are bound by these concurrent findings.

Nevertheless, evidence of this payment was received against Dorsey and was thrown in the scales against him in the decision. Referring to the payment of money to Clarke, the Patent Office committee report on which Dorsey was disbarred says:

> "Nearly six years elapsed after the article was filed in the Patent Office before other events, relevant to the conduct of these *respondents* with respect to it, occurred. These subsequent events cast their light backwardly on the activities of the *parties* during the time of preparation and filing of the Clarke article, giving added illumination with regard to the purposes, understandings, and intentions of *respondents* at that time." (Italics supplied.)

Thus it is clear that Hartford-Empire's later corruption in trying to suppress evidence, which we properly considered as a factor in deciding its case, was the decisive factor in finding Dorsey guilty, though he admittedly had no part in it. Without this misapplication of evidence, nothing in the record explains or excuses the harsh judgment of disbarment. Even though courts lean backward to avoid suspicion of partiality to men of our own profession, they should not fear to protect a lawyer against loss of his right to practice on such a record as this.